## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| DANIEL SEBAGH, derivatively on behalf of 2U, INC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>CHRISTOPHER J. PAUCEK, MARK J. CHERNIS, HARSHA MOKKARALA, PAUL A. MAEDER, ROBERT M. STAVIS, GREGORY K. PETERS, EARL LEWIS, TIMOTHY M. HALEY, CORETHA M. RUSHING, SALLIE L. KRAWCHECK, JOHN M. LARSON, EDWARD S. MACIAS, VALERIE B. JARRETT, ALEXIS MAYBANK, JAMES KENIGSBERG, and CATHERINE A. GRAHAM, )<br>)<br>Defendants, )<br>)<br>and )<br>)<br>2U, INC., )<br>)<br>Nominal Defendant. ) | Case No. 1:22-cv-01205-CFC<br><br>JURY TRIAL DEMANDED |

## REDACTED VERSION OF VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Daniel Sebagh ("Plaintiff"), by his attorneys, submits this Verified Stockholder Derivative Complaint. Plaintiff alleges the following on information and belief, except as to the allegation specifically pertaining to Plaintiff, which is based on personal knowledge. This complaint is also based on the investigation of Plaintiff's counsel, which included, among other things, a review of (a) documents produced to Plaintiff by 2U, Inc. ("2U" or the "Company") in response to a demand to inspect books and records pursuant to 8 *Del. C*.§ 220 ("Section 220") (the "Books and Records Production"); (b) filings in various proceedings, including a class action lawsuit alleging violations of federal securities laws captioned, *In re 2U, Inc. Securities Class Action*, Case No. 8:19-cv-03455-TDC (the "Securities Action")

and the August 5, 2021 decision of the District Court in that case denying defendants' motion to dismiss (c) the Company's public filings with the U.S. Securities and Exchange Commission ("SEC"); and (d) news reports, press releases, and other publicly available sources concerning 2U.

## NATURE OF THE ACTION

1.      This is a shareholder derivative action brought in the right, and for the benefit, of 2U against certain of its officers and directors seeking to remedy Defendants' (defined, *infra*) violations of law that have caused, and continue to cause, substantial harm to 2U and its shareholders, including monetary losses and damages to 2U's reputation and goodwill.

2.      2U is an educational technology company that builds, delivers, and supports online degree and non-degree programs for non-profit institutions and universities.

3.      This complaint arises from Defendants' false statements and material omissions concerning the Company's breakthrough business growth model that was purportedly poised to dominate the educational market. The Company promoted its data-driven marketing capabilities as being successful and efficient in attracting students, and, proposed to add graduate programs and short courses with new and existing university clients and increase student enrollments and expand their non-degree offerings. 2U represented this strategy as a scalable business model.

4.      Defendants, however, knew █████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████

5.      The Company assured investors that the "marketing funnel," which begins with a prospect clicking on an online ad and ends with an application to a program, was functioning as intended at all relevant times and that their "data driven" and "high touch" marketing efforts were producing the desired results. However, this was not the case. ██████████████████████████

2

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

██████████████████████████████████████████

███████

6.      On July 19, 2018, Spruce Point Management prepared a scathing report challenging the Company's reported growth ("Investment Research Report"), stating 2U is a "money-losing education provider." The Investment Research Report stated that the firm had obtained documents that showed "compelling" evidence that 2U's long-term guidance will disappoint investors", that a significant portion of 2U's programs were underperforming, and that 2U's most successful programs would be difficult to replicate. Despite this damming report, on August 2, 2018, following 2U's financial results for the second quarter of 2018, Paucek reaffirmed the Company's commitment to the growth business model, stating "reacceleration of the grad business" is based on "enrollments and pipeline." In addition, he touted the pipeline of programs was "***stronger than it ever [sic] been***."

7.      Over the next several weeks, Paucek and the Company's Chief Financial Officer ("CFO") Cathern Graham ("Graham") made several public appearances at investor events during the following weeks, during which time they promoted 2U's new program offerings. For instance, on August 14, 2018, Paucek spoke at the KeyBanc Capital Markets Technology Leadership Forum regarding the robust lineup of 2U programs expected to launch in the upcoming years. Paucek stated there is "simply a continuously extending pipeline. Our pipeline is stronger than it's ever been, and it's not close. It is the best we've ever seen it."

8.      At all relevant times, the Individual Defendants intentionally or recklessly made

materially false and misleading statements and omitted to disclose that (i) the Company's forecasted student enrollment numbers were precipitously declining; (ii) the Company's student acquisition model would not scale to correspond to the enrollment requirement of its expanding portfolio of programs; (iii) the Company's student acquisition expenses were swiftly and inexorably rising; (iv) the Company encountered substantial competition in the market for student enrollments; (v) the Company's pace of revenue growth rate from student enrollments was decelerating; and (vi) the Individual Defendants failed to maintain adequate internal controls.

9. On May 7, 2019, in announcing its first quarter results, 2U reduced its revenue projection by $13 million compared to prior guidance due to "some decline in expected graduate program enrollments." On this news, the Company's share price fell $15.16, over 25%, to close at $44.77 per share on May 8, 2019, on unusually heavy trading volume.

10. On July 30, 2019, 2U issued a press release revealing that costs had soared, compelling it to forgo its growth plans and further reduce its fiscal 2019 guidance. The Company's estimated net loss for fiscal 2019 was increased by $70 million, with the reported loss representing a 300% year-over-year increase. On this news, the Company's stock price fell $23.70, or 65%, to close at $12.80 per share on July 31, 2019, on unusually heavy trading volume.

11. Proliferation of the false statements detailed herein caused 2U stock to be artificially inflated at all relevant times. While 2U stock was trading at these artificially inflated prices, Paucek, Timothy Haley ("Haley"), Mark Chernis ("Chernis"), James Kenigsberg ("Kenigsberg"), and Earl Lewis ("Lewis") (collectively "Insider Trading Defendants") sold thousands of shares of Company stock for millions of dollars while in possession of material non-public Company information related to profitability.

12.     As a result of the foregoing, investors filed the Securities Action, which names 2U's president, co-founder, chief financial officer, chief operating officer, and directors as defendants.

13.     On August 5, 2021, U.S. District Judge Theodore D. Chuang denied the defendants' motion to dismiss the Securities Action, holding that claims under Section 10(b) of the Securities Exchange Act of 1934 and Section 11 of the Securities Act of 1933 had been adequately plead against 2U, certain of its officers, and certain of its directors under heightened pleading standards (the "Order").

14.     Among other things, Judge Chuang found that the defendants in the Securities Action "failed to acknowledge the declining enrollment projections." The Order states, for example, that "Paucek did not merely use vague, positive language about 2U's future but instead specifically conveyed that the previously described reacceleration was continuing and supported that assertion with a specific factual basis—enrollment information." *Id*. at 23.

15.     The Securities Action has subjected the Company to internal investigations, losses from the waste of corporate assets, and losses due to the unjust enrichment of Individual Defendants were also improperly compensated by the Company.  Indeed, earlier this year, the parties to the Securities Action announced their agreement to settle plaintiffs' claims in exchange for $37,000,000.

16.     To make matters worse, as the Company's share price declined, members of the Board approved their own improper and grossly excessive compensation without meaningful limits or controls, and without regard for the Company's stock price, revenue, and market capitalization.

## JURISDICTION AND VENUE

17.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Securities Exchange Act (the "Exchange Act") and Rule 14a-9 of the Exchange Act.

18.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

19.     This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who is either present in this District for jurisdictional purposes or has, directly and indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities exchanges and markets, such that each defendant has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

20.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because 2U is incorporated in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this district by engaging in numerous activities that had an effect in this District.

## PARTIES

*Plaintiff*

21.     Plaintiff is a current shareholder of 2U common stock. Plaintiff has continuously held common stock at all relevant times.

*Nominal Defendant*

22.     2U is a Delaware corporation with its principal executive offices located at 7900 Harkins Road, Lanham, Maryland 20706. The Company stock trades on the NASDAQ exchange under the symbol "TWOU."

*The Individual Defendants*

6

**Christopher Paucek**

23.     Defendant Christopher J. Paucek ("Paucek") has served as CEO, Co-Founder, and director of the Company since October 2012.

24.     According to the Company's Schedule 14A filed with the SEC on April 21, 2022 (the "2022 Proxy Statement"), Defendant Paucek owned 859,341 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Paucek beneficially owned $9,083,234.37 of 2U stock.

25.     For the fiscal year ended December 31, 2021, Defendant Paucek received $17,406,594 in compensation. This included $ 726,462 in salary earned, $15,851,749 in stock awards, $822,221 in non-equity compensation, and $6,162 in all other compensation.

26.     The 2022 Proxy Statement states the following about Defendant Paucek:

> Mr. Paucek is a co-founder of the Company and has served as our Chief Executive Officer and as a member of our Board since 2012. He previously served as our President and Chief Operating Officer from April 2008 through December 2011. Prior to 2U, Mr. Paucek served as the Chief Executive Officer of Smarterville, Inc., the parent company of Hooked on Phonics, from 2007 until 2008. From 2004 to 2007, Mr. Paucek served as Vice President of Business Development and President of Educate Products for Educate, Inc. In 2004, Mr. Paucek served as Deputy Campaign Manager for the successful reelection campaign of United States Senator Barbara Mikulski. Mr. Paucek began his career in 1993 by co-founding Cerebellum Corporation, the media company behind the award-winning educational television program and video series, Standard Deviants, and he led Cerebellum as Co-Chief Executive Officer until 2003. Mr. Paucek holds a B.A. from The George Washington University and an M.B.A. from the Kenan-Flagler Business School of the University of North Carolina at Chapel Hill.
>
> Qualifications:
>
> Our Board believes that Mr. Paucek's knowledge of the Company as one of our co-founders, and his broad experience leading education companies, enable him to make valuable contributions to the Board.

**Mark Chernis**

27. Defendant Mark J. Chernis ("Chernis") served as a director from 2009 to May 20, 2018, when he was appointed Chief Operating Officer. Prior to that, he served on the Board since January 2009.

28. According to the Company's 2022 Proxy Statement, Defendant Chernis owned 478,895 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Chernis beneficially owned $5,061,920.15 of 2U stock.

29. For the fiscal year ended December 31, 2021, Defendant Chernis received $8,825,660 in compensation. This included $540,846 in salary earned, $7,753,780 in stock awards, $524,315 in non-equity compensation, and $6,719 in all other compensation.

**Harsha Mokkarala**

30. Defendant Harsha Mokkarala ("Mokkarala") served as 2U's Chief Data Scientist since September 2020. Defendant Mokkarala was also Chief Revenue Officer from April 2018 to September 2020.

**Paul Maeder**

31. Defendant Paul A. Maeder ("Maeder") served as Chairman of the Board since November 2012 and as a director of the Company since 2010. In addition, he served as a member of the Audit Committee.

32. According to the Company's 2022 Proxy Statement, Defendant Maeder owned 172,614 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Maeder beneficially owned $1,824,529.98 of 2U stock.

33. For the fiscal year ended December 31, 2021, Defendant Maeder received $367,400 in compensation. This included $136,500 in fees earned and $230,900 in stock awards.

34. The 2022 Proxy Statement states the following about Defendant Maeder:

Mr. Maeder has served on our Board since 2010 and as Chair of our Board since November 2012. Mr. Maeder is a General Partner of Highland Capital Partners, a venture

8

capital firm he co-founded in 1987 and serves as the Chief Financial Officer of Highland Transcend Partners I Corp. He currently serves on the board of one private company and one university. Mr. Maeder served as a director of Imprivata, Inc. from February 2002 to July 2016 and of Carbon Black, Inc. from September 2015 to February 2019. He holds a B.S.E. in Aerospace and Mechanical Sciences from Princeton University, an M.S.E. in Mechanical Engineering from Stanford University and an M.B.A. from Harvard Business School.

Qualifications:
Our Board believes that Mr. Maeder's extensive experience investing in the online higher education and software industries and his experience serving as a board member for numerous companies enable him to make valuable contributions to the Board.

**Robert M. Stavis**

35.     Defendant Robert M. Stavis ("Stavis") has served as a director of the Company since 2011. In addition, he served as Chairman of the Audit Committee.

36.     According to the Company's 2022 Proxy Statement, Defendant Stavis owned 130,339 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Stavis beneficially owned $1,377,683.23 of 2U stock.

37.     For the fiscal year ended December 31, 2021, Defendant Stavis received $310,900 in compensation. This included $80,000 in fees earned and $230,900 in stock awards.

38.     The 2022 Proxy Statement states the following about Defendant Stavis:

Mr. Stavis has served on our Board since 2011. Mr. Stavis has been a Partner at Bessemer Venture Partners, a venture capital firm, since 2000. He currently serves on the boards of several private companies. Prior to joining Bessemer, Mr. Stavis was an independent private equity investor. Prior to that, he served in various positions at Salomon Smith Barney, including as Co-Head of Global Arbitrage Trading. Mr. Stavis holds a B.A.S. in Engineering from the University of Pennsylvania's School of Engineering and Applied Sciences and a B.S. in Economics from the University of Pennsylvania's Wharton School.

Qualifications:

Our Board believes that Mr. Stavis's broad experience investing in the emerging software technology industry and his experience serving as a board member for numerous companies enable him to make valuable contributions to the Board.

**Gregory K. Peters**

39.    Defendant Gregory K. Peters ("Peters") has served as a director of the Company since March 2018. In addition, he is a member of the Audit Committee.

40.    According to the Company's 2022 Proxy Statement, Defendant Peters owned 156,272 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Peters beneficially owned $1,651,795.04 of 2U stock.

41.    For the fiscal year ended December 31, 2021, Defendant Peters received $298,400 in compensation. This included $67,500 in fees earned and $230,900 in stock awards.

42.    The 2022 Proxy Statement states the following about Defendant Peters:

Mr. Peters was appointed to our Board in March 2018. Mr. Peters joined Netflix, Inc. in 2008 and currently serves as the Chief Operating Officer and Chief Product Officer, responsible for designing, building and optimizing the customer experience. From 2015 to July 2017, Mr. Peters served as the International Development Officer of Netflix, responsible for global partnerships with consumer electronics companies, Internet service providers and multichannel video program distributors. From July 2013 to 2015, Mr. Peters served as the Chief Streaming and Partnerships Officer of Netflix. Prior to joining Netflix in 2008, Mr. Peters was Senior Vice President of Consumer Electronics Products for Macrovision Solutions Corp. (later renamed Rovi Corporation) and held positions at Mediabolic Inc., Red Hat Network and Wine.com. Mr. Peters currently serves on the board of directors of Highland Transcend Partners I Corp. and DoorDash Inc. Mr. Peters holds a B.S. in Physics and Astrophysics from Yale University.

Qualifications:
Our Board believes that Mr. Peters' technology and product expertise enable him to make valuable contributions to the Board.

Other Current Public Boards:
Highland Transcend Partners I Corp.
DoorDash Inc.

**Earl Lewis**

43.    Defendant Earl Lewis ("Lewis") has served as a director of the Company since April 2014. In addition, Defendant Lewis is a member of the Audit Committee.

44.    According to the Company's 2022 Proxy Statement, Defendant Lewis owned 18,516

10

shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Lewis beneficially owned $195,714.12 of 2U stock.

45.     For the fiscal year ended December 31, 2021, Defendant Lewis received $298,400 in compensation. This included $67,500 in fees earned and $230,900 in stock awards.

46.     The 2022 Proxy Statement states the following about Defendant Lewis:

> Dr. Lewis was appointed to our Board at the time of the initial public offering of the Company's shares in April 2014. Dr. Lewis, a fellow of the American Academy of Arts and Sciences, is the Thomas C. Holt Distinguished Professor of History and AfroAmerican and African Studies and Public Policy at the University of Michigan and founding director of the Center for Social Solutions. From March 2013 to March 2018, Dr. Lewis served as President of The Andrew W. Mellon Foundation, a philanthropic organization committed to advancing higher education, the arts and civil society. From January 2013 to March 2013, he served as President-designate of the Mellon Foundation. Prior to joining the Mellon Foundation, Dr. Lewis served as Provost and Executive Vice President for Academic Affairs at Emory University from 2004 to December 2012. He also held a variety of faculty positions at the University of California at Berkeley and the University of Michigan from 1984 through 2004, and served as Vice Provost for Academic Affairs—Graduate Studies and Dean of the Horace H. Rackham School of Graduate Studies at the University of Michigan from 1998 to 2004. Dr. Lewis holds a B.A. from Concordia College and an M.A. and Ph.D. from the University of Minnesota.

> Qualifications:
> Our Board believes that Dr. Lewis's broad experience in academia, both as a faculty member and as an administrator at leading universities, allows him to make valuable contributions to the Board.

**Timothy M. Haley**

47.      Defendant Timothy M. Haley ("Haley") has served as a director of the Company since 2010.  In addition, he is a Chairman of Nominating and Corporate Governance Committee.

48.     According to the Company's 2022 Proxy Statement, Defendant Haley owned 16,562 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Haley beneficially owned $175,060.34 of 2U stock.

49.     For the fiscal year ended December 31, 2021, Defendant Haley received $296,900 in compensation. This included $66,000 in fees earned and $230,900 in stock awards.

50.     The 2022 Proxy Statement states the following about Defendant Haley:

Mr. Haley has served on our Board since 2010. Mr. Haley is a founding partner of Redpoint Ventures, a venture capital firm, and has been a Managing Director of the firm since 1999. Mr. Haley was also the Managing Director of Institutional Venture Partners, a venture capital firm, from 1998 to 2010. From 1986 to 1998, Mr. Haley was the President of Haley Associates, an executive recruiting firm in the high technology industry. Mr. Haley currently serves on the board of directors of Netflix, Inc., Zuora Inc. and ThredUp Inc. Mr. Haley holds a B.A. from Santa Clara University.

Qualifications:
Our Board believes that Mr. Haley's broad experience investing in software, consumer Internet and digital media industries, and his experience serving as a board member for numerous companies, enable him to make valuable contributions to the Board.

Other Current Public Boards:
Netflix, Inc.
Zuora Inc.
ThredUp inc

**Coretha M. Rushing**

51.     Defendant Coretha M. Rushing ("Rushing") has served as a director of the Company since 2016. In addition, Defendant Rushing is a member of the Compensation Committee.

52.     According to the Company's 2022 Proxy Statement, Defendant Rushing owned 16,265 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Rushing beneficially owned $171,921.05 of 2U stock.

53.     For the fiscal year ended December 31, 2021, Defendant Rushing received $295,900 in compensation. This included $65,000 in fees earned and $230,900 in stock awards.

54.     The 2022 Proxy Statement states the following about Defendant Rushing:

Ms. Rushing has served on our Board since 2016. She currently serves as the President of CR Consulting Alliance LLC and as a Managing Director and Executive Mentor for The ExCo Group, a global executive coaching firm. Ms. Rushing currently serves on the board of directors of Benefitfocus.com, Inc. and ThredUp Inc. She also serves as an external Board and HR advisor to several private company boards of directors. From May 2006 to December 2019 she served as Corporate Vice President and Chief Human Resources Officer of Equifax Inc. Prior to that, she served as an Executive Coach and HR Consultant with Atlanta-based Cameron Wesley LLC. Prior to joining

Cameron Wesley, she was Senior Vice President, Chief Human Resources Officer of The Coca-Cola Company, where she was employed from 1996 until 2004. Prior to that, she worked in several senior level positions for Pizza Hut (a division of PepsiCo) and IBM. Ms. Rushing was Chair of the Board for the Society of Human Resource Management until January 2019, an organization of approximately 350,000 global human resource professionals, and currently serves as Board Chair Emeritus. Ms. Rushing holds a B.S. in Industrial Psychology from East Carolina University and an M.S. in Education from The George Washington University.

Qualifications:
Our Board believes that Ms. Rushing's broad experience in human resources at leading Fortune 500 companies, enables her to make valuable contributions to the Board.

Other Current Public Boards:
 Benefitfocus.com, Inc.
 ThredUp Inc

**Sallie L. Krawcheck**

55.     Defendant Sallie L. Krawcheck ("Krawcheck") has served as a director of the Company since April 2014. In addition, Defendant Krawcheck is a member of the Nominating and Corporate Governance Committee.

56.     According to the Company's 2022 Proxy Statement, Defendant Krawcheck owned 31,425 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Krawcheck beneficially owned $332,162.25 of 2U stock.

57.     For the fiscal year ended December 31, 2021, Defendant Krawcheck received $290,900 in compensation. This included $60,000 in fees earned and $230,900 in stock awards.

58.     The 2022 Proxy Statement states the following about Defendant Krawcheck:

Ms. Krawcheck was appointed to our Board as of the initial public offering of the Company's shares in April 2014. Ms. Krawcheck is the Chief Executive Officer and co-founder of Ellevest, an investment and financial planning platform for women that was founded in 2016. Ms. Krawcheck was the President of Global Wealth & Investment Management for Bank of America from August 2009 to September 2011. Prior to joining Bank of America, Ms. Krawcheck held a variety of senior executive positions at Citigroup from 2002 to 2008, including Chief Executive Officer of its Smith Barney division, Chief Financial Officer of Citigroup and Chief Executive Officer and Chair of

Citi Global Wealth Management. She served as a director of BlackRock Inc. from 2009 to 2011 and Dell Inc. from 2006 to 2009. Ms. Krawcheck holds a B.A. from the University of North Carolina at Chapel Hill and an M.B.A. from Columbia University.

Qualifications:
Our Board believes that Ms. Krawcheck's financial acumen and broad experience serving in leadership roles with financial and investment firms enables her to make valuable contributions to the Board.

**John M. Larson**

59.    Defendant John M. Larson ("Larson") has served as a director of the Company since June 2009. In addition, he is Chairman of the Compensation Committee.

60.    According to the Company's 2022 Proxy Statement, Defendant Larson owned 78,119 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Larson beneficially owned $825,717.83 of 2U stock.

61.    For the fiscal year ended December 31, 2021, Defendant Larson received $300,900 in compensation. This included $70,000 in fees earned and $230,900 in stock awards.

62.    The 2022 Proxy Statement states the following about Defendant Larson:

Mr. Larson has served on our Board since June 2009. Mr. Larson has served as the Executive Chair of Triumph Higher Education Group, Inc., a culinary education company, since 2010. He also has served as President of Triumph Group, Inc., a company that advises and invests in domestic and international education companies, since 2008. Mr. Larson founded and served as President, Chief Executive Officer and director of Career Education Corporation, or CEC, a publicly held post-secondary education company, from its inception in 1994 through his retirement from the company in 2006, including as Chair of the Board from 2000 to 2006. He became Chair Emeritus of CEC in 2006 and continues to serve in that position. He holds a B.S. in Business Administration from the University of California at Berkeley.

Qualifications:
Our Board believes that Mr. Larson's deep knowledge of the higher education industry and his experience founding and leading a publicly held education company enable him to make valuable contributions to the Board.

**Edward S. Macias**

63.     Defendant Edward S. Macias ("Macias") has served as a director of the Company since November 2014. In addition, Defendant Macias is a member of the Nominating and Corporate Governance Committee.

64.     According to the Company's 2022 Proxy Statement, Defendant Macias owned 33,625 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Macias beneficially owned $355,416.25 of 2U stock.

65.     For the fiscal year ended December 31, 2021, Defendant Macias received $290,900 in compensation. This included $60,000 in fees earned and $230,900 in stock awards.

66.     The 2022 Proxy Statement states the following about Defendant Macias:

Dr. Macias has served on our Board since November 2014. Dr. Macias is currently the Provost Emeritus and Barbara and David Thomas Distinguished Professor Emeritus in Arts & Sciences at Washington University in St. Louis. Previously, Dr. Macias was the chief academic officer of Washington University in St. Louis for 25 years, before stepping down from his position as Provost and Executive Vice Chancellor in June 2013. During his tenure as Provost, Dr. Macias provided leadership in curriculum, budget and capital project development initiatives. Dr. Macias has broad experience and knowledge in higher education administration and innovation in academic settings. Following his tenure as Provost, Dr. Macias was nominated to lead the school's effort to explore its approach to online education and to leverage advances in education technology to enhance its reach and impact. Dr. Macias currently serves on the boards of Casa de Salud, Shakespeare Festival of St. Louis and the St. Louis Mosaic Project. He is an emeritus member of the boards of Colgate University and Mary Institute and St. Louis Country Day School. Dr. Macias holds an A.B. in Chemistry from Colgate University and a doctorate in Chemistry from Massachusetts Institute of Technology.

Qualifications:
Our Board believes that Dr. Macias's substantial knowledge of the higher education industry and his vast experience as Provost and Executive Vice Chancellor of Washington University in St. Louis enable him to make valuable contributions to the Board.

**Alexis Maybank**

67.     Defendant Alexis Maybank ("Maybank") has served as a director of the Company since December 2018. In addition, she serves on the Compensation Committee.

15

68.     According to the Company's 2022 Proxy Statement, Defendant Maybank owned 6,963 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Maybank beneficially owned $ 73,598.91of 2U stock.

69.     For the fiscal year ended December 31, 2021, Defendant Maybank received $295,900 in compensation. This included $65,000 in fees earned and $230,900 in stock awards.

70.     The 2022 Proxy Statement states the following about Defendant Maybank:

> Ms. Maybank has served on our Board since December 2018. She is an internet entrepreneur and currently serves as the Founder and Chief Executive Officer of Creative Beauty, Inc. From 2016 until December 2017 she served as the Co-Founder and Chief Executive Officer of Project September. Prior to co-founding Project September, she co-founded Gilt Groupe and served as its founding Chief Executive Officer from 2007 to 2008 and in several other executive roles, including Chief Strategy Officer, Chief Marketing Officer and President of Gilt Home and Kids from 2008 to 2014. Prior to co-founding Gilt Groupe in 2007, Ms. Maybank was General Manager of eCommerce for AOL Media Networks and served in various senior roles at eBay. Ms. Maybank holds a B.S. from Harvard University and an M.B.A. from Harvard Business School.
>
> Qualifications:
> Our Board believes that Ms. Maybank's experience in e-commerce and scaling rapidly growing technology companies enable her to make valuable contributions to the Board.

**Valerie B. Jarrett**

71.     Defendant Valerie B. Jarrett ("Jarrett") has served as a director of the Company since December 2017 and resigned on October 14, 2021.

72.     For the fiscal year ended December 31, 2021, Defendant Jarrett received $290,900 in compensation. This included $60,000 in fees earned and $230,900 in stock awards.

**Defendant Kenigsberg**

73.     Defendant James Kenigsberg ("Kenigsberg") served 2U's Chief Technology Offer from July 2010 to November 2021. In connection with his resignation, Defendant Kenigsberg and the Company have entered into a Separation, Consulting and Release Agreement, where Defendant

16

Kenigsberg remained an employee until January 2, 2022. Thereafter, he would serve as a consultant to the Company until 2024.

74.     According to the Company's 2022 Proxy Statement, Defendant Kenigsberg owned 77,021 shares of the Company's common stock. Based upon the closing price of the Company's stock on March 15, 2022, Defendant Kenigsberg beneficially owned $814,111.97 of 2U stock.

75.     For the fiscal year ended December 31, 2021, Defendant Kenigsberg received $4,351,413 in compensation. This included $ 415,908 in salary, $3,652,979 in stock awards, and $278,936 in non-equity compensation, and $3,590 in all other compensation.

**Catherine Graham**

76.      Defendant Catherine A. Graham ("Graham") served as CFO of the Company from April 2012 to August 21, 2019.

77.     According to the Company's 2020 Proxy for fiscal year ended December 31, 2019, Defendant Graham received $4,026,324 in compensation. This included $368,335 in salary, $113,750 in bonus, $2,088,645 in stock awards, $1,449,994 in option awards, and $5,600 in all other compensation.

## 2U'S CODE OF CONDUCT

78.     The Individual Defendants, like all employees, directors, and officers of the Company, are required to comply with 2U's Code of Business Conduct and Ethics (the "Code of Conduct"). The Code of Conduct states the following with respect to the responsibilities of the Board:

2. LEGAL COMPLIANCE

Obeying the law is the foundation of the Code of Conduct. Our success depends upon our personnel operating within legal guidelines and cooperating with local, national and international authorities. We expect our personnel to understand the legal and regulatory requirements applicable to their business units and areas of responsibility. While we do not expect you to memorize every detail of these laws, rules and regulations, we want you to be able to determine when to seek advice from others. If you have a question about legal compliance, you must seek an answer from your supervisor or the Compliance Officer.

Disregard of the law will not be tolerated. Violation of laws, rules and regulations of any country may subject an individual, as well as the Company, to civil and/or criminal penalties. You should be aware that conduct and records, including emails, are subject to internal and external audits and to discovery by third parties in the event of a government investigation or civil litigation. It is in everyone's best interests to know and comply with our legal obligations.

a.   Insider Trading

Personnel who have access to confidential (or "inside") information are not permitted to use or share that information for stock trading purposes or for any other purpose, except as authorized in order to conduct our business. All non-public information about the Company or about companies with which we do business is considered confidential information. To use material non-public information in connection with buying or selling securities, including "tipping" others who might make an investment decision on the basis of this information, is not only unethical, it is illegal and violates Company policy. You must exercise the utmost care when handling material inside information.

*  *  *

MAINTENANCE OF CORPORATE BOOKS, RECORDS, DOCUMENTS AND ACCOUNTS; FINANCIAL INTEGRITY; PUBLIC REPORTING

The integrity of our records and public disclosure depends upon the validity, accuracy and completeness of the information supporting the entries in our books of account. Therefore, our corporate and business records should be completed accurately and honestly. The making of false or misleading entries, whether they relate to financial results or otherwise, is strictly prohibited. Our records serve as a basis for managing our business and are important in meeting our obligations to our university partners, vendors, creditors, employees and others with whom we do business. As a result, it is important that our books, records and accounts accurately and fairly reflect, in reasonable detail, our assets, liabilities, revenues, costs and expenses, as well as all transactions and changes in assets and liabilities. We require that:

•  no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities or misclassifies any transactions as to accounts or accounting periods;

•  transactions be supported by appropriate documentation;

•  the terms of commercial transactions be reflected accurately in the documentation for those transactions and all such documentation be reflected accurately in our books and records;

•  personnel comply with our system of internal controls; and

18

• no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC.

Securities laws require that these reports provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations. Employees and independent contractors who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about the Company that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

• no employee or independent contractor may knowingly take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

• all employees and independent contractors must cooperate fully with our accounting and audit teams, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our reports filed with the SEC, are accurate and complete; and

• no employee or independent contractor should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our reports accurate in all material respects.

## 2U'S AUDIT COMMITTEE CHARTER

79.     In addition to these duties, under the Audit Committee Charter in effect during relevant times, Defendants Stavis, Lewis, Maeder, and Peters (the "Audit Committee Defendants") owed specific additional duties to 2U. The Audit Committee, pursuant to its Charter, is responsible for assisting the Board in overseeing the financial reporting processes on behalf of the Board and reporting the results of

its activities to the Board, and preparation and certification of the Company's financial statements, to

guarantee the independent auditors' report, or to guarantee other disclosures by the Company. In fact,

> The primary purpose of the Audit Committee (the "Committee") shall be to act on behalf of the Board of Directors (the "Board") of 2U, Inc., a Delaware corporation (the "Company"), in fulfilling the Board's oversight responsibilities with respect to (i) the Company's corporate accounting and financial reporting processes, (ii) the Company's systems of internal control over financial reporting and audits of financial statements, (iii) the quality and integrity of the Company's financial statements and reports, (iv) the qualifications, independence and performance of the registered public accounting firm or firms of certified public accountants engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing audit services (the "Auditors"), (v) the performance of the Company's internal audit function, and (vi) the Company's legal, regulatory and ethical compliance programs as established by management and the Board.
>
> * * *
>
> Responsibilities with respect to Financial Statements and Related Disclosures
>
> 11. Audited Financial Statement Review. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and to recommend to the Board whether such financial statements should be so included.
>
> * * *
>
> 13. Quarterly Results. To review and discuss with management and the Auditors, as appropriate, the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under standards of the PCAOB.
>
> 14. Management's Discussion and Analysis. To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.
>
> 15. Disclosure Committee. To meet with the Disclosure Committee (or a representative thereof), as part of the Committee's regular review of the Company's Form 10-K and Form 10-Q reports (and other filings by the Company with the SEC), when applicable and as deemed necessary, appropriate or desirable by the Committee or management.
>
> 16. Press Releases. To review and discuss with management and the Auditors, as

appropriate, earnings press releases, and press releases containing information relating to material developments as well as the substance of financial information, information relating to material developments and earnings guidance provided to analysts and rating agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of these discussions.

17. Accounting Principles and Policies. To review with management and the Auditors, as appropriate, significant issues that arise regarding accounting principles and financial statement presentation, including critical accounting policies and practices, alternative accounting policies available under generally accepted accounting principles ("GAAP") related to material items discussed with management, the potential impact on the Company's financial statements of off-balance sheet arrangements and, as the Committee deems appropriate, any other significant reporting issues and judgments, significant regulatory, legal and accounting initiatives or developments that may have a material impact on the Company's financial statements, compliance programs and policies.

80.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of 2U, were able to and did directly or indirectly, exercise control over the wrongful acts complained of herein. The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal action. As a result, and in addition to the damages the Company already incurred, 2U has needlessly expended, and will continue to needlessly expend, significant sums of money.

## THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

81.    By reason of their positions as officers, directors, and/or fiduciaries of 2U, and because of their ability to control the business and corporate affairs of the Company, at all relevant times, the Individual Defendants owed 2U and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.

82.    The Individual Defendants were required to act in furtherance of the best interests of 2U and its shareholders so as to benefit all shareholders equally and not in furtherance of their own personal interest or benefit.

83. Each director and officer of the Company owes to 2U and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

84. The Individual Defendants, because of their positions of control and authority as directors and/or officers of 2U, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein. Because of their advisory, executive, managerial, and directorial positions with 2U, each of the Individual Defendants had knowledge of material non-public information regarding the Company. To discharge their duties, the officers and directors of 2U were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company. By virtue of such duties, the officers and directors of 2U were required to, among other things:

(a) Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

(b) Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable district and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

(c) Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

(d) When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

85. The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by 2U.

86. Each of the Individual Defendants breached his or her fiduciary duties as alleged herein, both individually and in concert with the other Defendants.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

87.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

88.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct were, among other things, to (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, and abuse of control; (ii) conceal adverse information concerning the Company's operations, financial condition, future business prospects and internal controls; and (iii) artificially inflate the Company's stock price.

89.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully, recklessly, or with gross negligence to engage in deceptive marketing, engage in improper accounting methods, conceal material facts, fail to correct such misrepresentations, and violate applicable laws. At all relevant times, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did engage in deceptive marketing. In furtherance of this plan, conspiracy, and course of conduct, Individual Defendants collectively and individually took the actions set forth herein. The Individual Defendants described herein were a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of here because the action described herein occurred under the authority and approval of the Board.

90.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the

wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

91.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and 2U and was at all times acting within the course and scope of such agency.

## SUBSTANTIVE ALLEGATIONS

### *Factual Background*

92.     In collaboration with nonprofit schools and universities, 2U runs a "software-as-a-service" platform and a package of technology-enabled services such as coursework creation and infrastructure maintenance. Company revenue is generated by two segments: a Graduate Program and Short Course Program launched by 2U in mid-2017 via the acquisition of GetSmarter.

93.     In recent years, 2U has actively expanded its Company through a growth plan that involves the addition of additional graduate program offerings and the expansion of its university clientele. In 2019, 2U planned to introduce over 15 additional graduate programs, and the Board said that 21 more would be added the following year.

94.     While institutions retain complete control over admissions, 2U is responsible for identifying prospective students and assisting them through the application process.

95.     For the Graduate Division business model to be lucrative, agreements with institutions must be long-lasting. Initiating a program demands a considerable investment from 2U, between $5 and $10 million per program on average, and university clients contribute to initial terms of 10 to 15 years.

Universities then compensate 2U with a percentage of the tuition and fees students pay to acquire the degree.

96.     However, there is a significant delay between incurring the expense of acquiring a student and receiving the revenue from that student. About seven months pass between initial contact and enrollment on average with the average student's enrollment lasting two years.  To address this, the Company monitors the cost of student acquisition by comparing the total revenue generated by a student, which the Individual Defendants referred to as Lifetime Revenue ("LTR"), to the total cost of acquiring a student, called Total Cost of Acquisition ("TCA"). The ratio was calculated by dividing LTR by TCA; a greater ratio indicated a larger average profit per student.



***Fourth Quarter and Full Year 2017 Financial Results***

98.     On February 26, 2018, the Company issued a press release to announce its fourth quarter and full year 2017 financial results. For fiscal 2018, the Company anticipated revenues between $397.7 million and $402.7 million and net loss between $45 million and $42.8 million. The press release stated, in relevant part,

> "A decade into our journey, 2U is now at the forefront of the digital transformation in higher education and the strength of our business performance and the high quality student outcomes in our partner programs prove it," CEO and Co-Founder Christopher "Chip" Paucek said. ***"The positive momentum in our GetSmarter short course business combined with the organic growth in our graduate program business produced strong fourth quarter and full-year 2017 financial results and sets us up***

*nicely for 2018*."

99.     The same day, 2U hosted a conference call with analysts and investors to discuss the financial results.  In his opening remarks, Defendant Paucek highlighted the Company's fast development, noting that most of the growth occurred in the Graduate Division, stating in relevant part:

> *What's driving our progress? Well, in the graduate program segment, which we now refer to as our 2U Grad division, we began the acceleration of our new DGP launch cadence.* Ten new programs launched in 2017. We increased our 2018 slate from 13 to 14 new programs, and we've now announced 3 of the 16 new programs for 2019.

100.     During that same call, Defendant Paucek explained the results of 2U internal outcomes observed conformed to the expansion growth plan that Individual Defendants outlined to investors, stating:

> This time period corresponds to our period of heaviest net negative cash investment in new program launch and scaling. And for 2017, these programs had a combined loss margin of 400%. And while this represents an increased loss for this cohort compared to the prior year period, the increase is driven primarily by the continuing expansion of our annual launch calendars. *What we're seeing now across all our program cohorts strongly validates the typical program economic life cycle we've discussed with you and makes us very comfortable that increasing our investment in new programs to drive growth is a wise, strategic decision.*

### KeyBank Capital Markets Emerging Technology Summit

101.     On February 28, 2018, Defendant Graham appeared at the KeyBank Capital Markets Emerging Technology Summit. During her remarks, Defendant Graham praised the Company's "data driven" tactic of student acquisition, stating that student acquisition costs were "one of the tricks [of the] business," and claiming that "what will kill the business is if you don't get very, very good and very data-driven at projecting how many students you're going to get off of specific marketing channels." Defendant Graham further stated that 2U carefully managed its student acquisition costs, stating:

> We manage to a ratio of lifetime revenue of a student to the total cost to acquire, and we basically manage that to about a 3.2:1 is our target ratio. At various times, we may

be aggregating to a little lower, a little higher depending on where our programs are in the cycles. ***But we pretty much manage in that sort of 3.1, 3.2 because we know that that's what will allow us to get to our long term target margins.*** So, it is not in any way an accident that our -- the people who are key to our marketing department come from Capital One and other places like that and are more data-driven, started off as actuaries and data analysts as opposed to more traditional marketers. ***But we forecast that, and we test it, and we tested and we've gotten very, very good at that. So, that is really – that's a definite key to the business and that's how we manage it.***

102.    In addition, Defendant Graham remarked that 2U had a competitive advantage amongst other corporations because comparable companies did not have the same business model, stating that there was a "moat" around its business:

This type of business model is to invest a lot less money, do a lot more programs, and so it's more programs, and so it's more horizontal. They'll invest $750,000 instead of $7 million or $8 million or $10 million and they'll get 100 students instead of 500 students per year. So, there's a sort of different flavor to it. There are a couple of companies that are out there, HotChalk being, Everspring being another, that we particularly thought those two might look more like us particularly after HotChalk took a very large investment from Bertelsmann, but we haven't seen them move in that direction. ***And I would say the moat that we built around our business is multifaceted, the first is obviously the investment.*** You have to have a lot of capital to get into this business if you're going to do it the way we're going to do it, investing that kind of money per program.

***The Board's April 25, 2018 Meeting Minutes and Materials***





***First Quarter 2018 Financial Results***

106.    On May 3, 2018, the Company filed a Form 10-Q for the quarter ended March 31,2018 (the "1Q 2018 10-Q") with the SEC, which contained signed certifications pursuant to the SOX by Defendants Paucek and Graham, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

107.    That same day, the Company also filed a press release on Form 8-K reporting first quarter 2018 financial results announcing its financial results for the first quarter of 2018 ("1Q 2018") and increasing its revenue guidance for fiscal year 2018 by $8 million to a range of $406.6 to $410.6 million.

108.    In his opening remarks, Defendant Paucek highlighted the growth business model, stating, "2U is creating a strong sustainable business for our shareholders and for our University partners." In

addition, Defendant Paucek touted the Company's revenue growth, exclaiming, "we remain confident in our grad program segment revenue growth for 2018, and that growth rate accelerating into 2019 and 2020." Defendant Paucek also praised the Company for converting leads into sales, stating, "Let me say here, pipeline is excellent."

109.    Defendant Paucek highlighted the Company's purported positive business growth, "Our short course business has emerged as a powerful contributor to our growth story." When combined with the expected growth of our Graduate Program Segment, revenue guidance is up about $8 million over our prior guidance." Notably, there has been an exponential increase in the number of launched programs, touting that "over the past few years and shows no signs of slowing down. Our pipeline also continues to be strong, giving us confidence in our revenue expectations in that core segment in future years."

110.    During the question-and-answer session, Defendant Paucek responded to a question regarding whether 2U's customers were interested in "fee for service" rather than the all-inclusive package that 2U offers. In response, Defendant Paucek stated:

> And so our pipeline is excellent for a reason. **_We are able to prove that our value is really strong, and it is getting stronger._** The portfolio of tech and service that we provide our clients is better than it used to be. And we just have a tremendous amount of data to share with them about all aspects of it. We are in the process of rebranding our stack as 2U OS for a reason. It's a really comprehensive approach to building quality. And the reason we gave some color on the surplus is, specifically, that whether you're revenue share or fee for service, there is no moral superiority to it. It is fundamentally, are you good? Are you delivering? And some of the newer folks are going to have to figure that out, and it's not easy, it took us a long time to get really, really good. And guess what, we're really good.

111.    Also on the call, Henry Chien, an analyst from BMO Capital Markets Equity Research, opined Defendant Paucek for more detail concerning the "marketing side."

**Henry Chien [analyst]**

Hey, guys, good afternoon. It's Henry Chien calling in for Jeff. I was curious about some of the comments you made on the marketing side. It sounded like that you're becoming - since you're very good at the marketing process, just wondering if you

could share a little bit more detail around that. Are you able to get enrollments faster and get students faster? Are you able to scale that more efficiently, just any color you can provide there would be great?

**Christopher Paucek [CEO]**

I think, overall, I guess, that's a pretty broad question. So I would say, I would argue that sort of overall ecosystem that we operate now is at scale. And we're seeing real benefit from that. The quality of the people that we're able to hire, the quality of the growth of those people, whether it will be or some of the folks that are sort of running the, Brian Lane, the folks that are running the opportunity for the company are just doing a tremendous job. So we are certainly getting better.

112.     On the same day, 2U hosted a conference call with analysts and investors to discuss the Company's first quarter 2018 results. Defendant Paucek highlighted the Company's "excellent quarter" which saw a 42% revenue growth from the previous year. He assured investors that "[t]he short course business is thriving," so much so that 2U had "enough confidence … to raise full year revenue guidance significantly by over $8 million." Furthermore, according to Defendant Paucek, 2U's technology is clearly superior to that of other educational technology providers, making it improbable for them to compete with the Company. In particular, Defendant Paucek stated:

> Let's start with our recent results. ***Another excellent quarter. Revenue for Q1 was $92.3 million, up 42% improvement year-over-year***. GAAP performance on the top line was driven by results in our Grad segments that were in line with our expectation and another strong quarter for the short course segment with $11.7 million in revenue. ***With 3 quarters of short course operating history under our belt, we have enough confidence in the short course business to raise full year revenue guidance significantly by over $8 million. This represents an increase in our expected revenue growth rate of almost 3 percentage points compared to our previous guidance.*** At the midpoint of the new range, we expect year-over-year revenue growth of over 42%. The short course business is thriving as part of 2U. We've rebranded the GetSmarter headquarters to 2U Cape Town, and are finding a great benefit in working more closely together. We're opening up new market channels for short courses, which resulted for a time this quarter in GetSmarter being the fastest growing advertiser on the major social media platform.

* * *

> Other companies in this space might like to argue they can compete, but our business model is robust for our partners and in turn for 2U. No other companies in the space

30

invest like 2U. No one builds the scale like 2U. No one has a comprehensive approach to quality like2U. We do a ton of work for our schools that others in the space simply don't and often can't do. And you don't need to take my word for it. Our clients are saying it.

At Investor Day, Kent Syverud, the Chancellor of Syracuse University, stated his strong belief that Syracuse received significant value from the investments we make with the portion of the rev share, that the 2U takes, providing world-class technology support and care in areas that the university shouldn't really be focused on. And in doing so, we drive incredible student outcomes. But financial sustainability is also critical. ***Our long-term relationships, which are really like partnership expressed through a revenue share, are producing a powerful business model for our partners that they simply can't find elsewhere.***

113.    Also, during the call, in answer to a query from an analyst about whether competitors are entering 2U's market, Defendant Paucek once more insisted that competition merely served to legitimize 2U's business model:

So in general, I feel like the folks moving into our space, we've had people moving into our space for what is now over 10 years. So while -- I don't want to sound like ***I take competition that I think of them, that we think it's trivial. We're always looking at our service offering and our tech offering***.

\* \* \*

And in general, we think competition, overall, in the space, is positive thing, not a negative thing, because the biggest issue we still have is preconceived notions of online education. So as more high-quality brands -- and even sort of broad more mainstream brands come into the space like the Purdue and Kaplan relationship, ***we see that as generally more of a positive than a negative.***

***The Offering Materials***

114.    On May 21, 2018 and May 23, 2018, the Company filed a Registration Statement and Rule 424(b) Prospectus (together, the "Registration Statement") with the SEC for the Secondary Public Offering of $300 million worth of shares of 2U common stock.

115.    The Offering Materials incorporated by reference the Form 10-K for the fiscal year ended December 31, 2017, which had been filed with the SEC on February 27, 2018 ("2017 10-K"). The 2017 10-K was signed by Defendants Paucek, Graham, Maeder, Stavis, Peters, Haley, Jarrett, Lewis, Rushing,

Krawcheck, Larson, Macias, and Chernis. According to the 2017 10-K, 2U's growth strategy was "to add graduate programs and short courses with new and existing university clients and increase student enrollments across our entire portfolio of offerings."

116.    The Company touted the exceptional growth story stating, "from one client with one program in one academic discipline in 2008 to 24 clients with 51 programs in 23 degree verticals today, 37 of which have launched and have students enrolled."

117.    The 2017 10-K also stated that 2U had improved its capabilities for student acquisition, which led to increased demand and increased growth:

> Over the past decade, we have developed new and innovative tools within our platform to enhance the effectiveness of instructional methods and improve student outcomes and the student experience. ***During that time, we have also refined our program selection algorithm and improved our data-driven digital marketing capabilities across our ecosystem of offerings to generate increased student enrollments in a cost effective manner***. As a result, demand for our comprehensive platform of integrated technology and services has increased significantly. ***Since 2008, we have expanded our university client base from one to 24 across our entire portfolio of offerings, increased the number of 2U-powered graduate programs from one to 37, and enrolled over 33,000 graduate students.***

***Robert W. Baird & Co. Global Consumer, Technology & Services Conference***

118.    On June 5, 2018, Defendant Mokkarala prepared a presentation at the Robert W. Baird & Co. Global Consumer, Technology & Services Conference. In his opening statement and accompanying presentation, Defendant Mokkarala made numerous claims regarding the effectiveness of and success of 2U's marketing tactic. His role was described as follows:

> "Harsha is 2U's Chief Revenue Officer, which includes marketing responsibilities. He was previously Chief Marketing Officer, which for those that don't know, a very important role at 2U in two regards. One, Chief Marketing Officers help decide what programs they should target, so what business they should greenfield; and two, digital marketing or marketing spend is the single largest expense category for just running 2U. But Harsha is mostly going to give a formal presentation, kind of run through his role in the marketing function at 2U."

119.    During the conference, Defendant Mokkarala praised 2U's marketing prowess regarding student acquisition, stating:

> It's really a needle in a haystack. There is a small community of people who are interested in this and ***finding these people and making sure we are supporting them through the process of both becoming a student, as well as graduating from these programs, is really what we bring to the table***. And data and analytics are a key guide to getting that right.
>
> ***And we are able to find these audiences at scale with bespoke campaigns and spend for each university program. Like I said, all of our marketing is directed at specific brands, specific universities***. The fact that we're able to do this at scale across lots of verticals and lots of programs within each of those verticals -- we define a vertical as business is a vertical, law is a vertical, [indiscernible] subject area. ***The fact that we are able to do this across verticals and with lots of programs with no verticals helps us create a certain amount of leverage and a network effect that is super important***.

120.    Defendant Mokkarala stated the following regarding multi-program verticals:

> ***Another thing that we bring that is unique to the table is multiprogram verticals. This is the notion of doing multiple programs within a given verticals.*** We power 12 different MBAs across the country and now in the United Kingdom with University College London. And each of these gives us an opportunity to build a custom higher education audience and leverage it in the sense that we gather a ton of data on sort of what this market looks like and. the ability to apply that data that we gather across this network to the betterment of each of these individual programs. That means finding more students for each of these programs and improving the efficiency, which means you can do more of it. It's super, super critical. . . . ***So multi-program verticals are a great way for us to grow the pie overall both for individual program as well as for the network.***

121.    Defendant Mokkarala continued to reiterate 2U's growth narrative and gave the impression that the Company was scaling smoothly and in accordance with revenue expectations. He stated:

> And, of course, it's our responsibility to continue growing these audiences. So through site acquisitions, through new media partnerships, through testing offline channels, we are constantly going to be finding these new channels and using our data and our frameworks to evaluate and continue to scale those. And, of course, we can also grow our audiences through product marketing, through improving our product. New degree offerings, concentrations program announcements. All of those are keyways in which we do this as well. And what does all this meant, what does all of this alignment and sort of growth meant [] ***meant significant growth for the business, right. CAGR of***

33

*39.4%, 5% over time and significant growth and scale to our university partners is what this [] meant.*

**The Board's June 2018 Materials**



███████████████████████████████████████

███████████████████████████████████████

████████████████████████████████████

*Spruce Point Investors Research Report*

129.    On July 19, 2018, Spruce Point issued a report, arguing that 2U's programs were underperforming, including "eight of the 14 programs launched between 2013 and 2015" and four of the top seven programs which had reached peak or declining enrollments. The report also questioned numerous aspects of 2U's business model, asserting that several underlying issues would negatively affect its growth expectations. These issues included: (a) declining tuition costs in competing programs would put pressure on tuition for 2U's programs, undermining the Company's assumption that it will reach steady state revenues of $16 million per program; (b) that competition for students among online programs was intensifying, pressing margins since 2U would have to increase its student acquisition expenditures; (c) Company's May 2017 acquisition of GetSmarter was intended to mask domestic growth slowdown; and (d) 2U's SPO noted the possibility of potential future acquisitions, which raised concerns about the Company's organic growth prospects. However, the Individual Defendants continued to deny the allegations.

*Second Quarter 2018 Financial Results*

130.    On August 2, 2018, the Company filed a Form 10-Q for the quarter ending June 30, 2018 ("2Q 2018 10-Q") with the SEC, which contained signed certifications pursuant to the SOX by Defendants Paucek and Graham, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

131.    Also, on that same day, the Company filed a press release regarding the results on Form

36

8-K, which disclosed that 2U was raising full year 2018 revenue projections to between $409.7 and $412.2 million and provided third quarter 2018 revenue projections of between $106 and $107 million.

132.    In addition, on August 2, 2018, Defendants Paucek and Graham conducted a conference call to announce the Company's financial performance for the second quarter of 2018. Numerous questions regarding the Company's business strategy and growth objectives surfaced when the Individual Defendants made their first public appearance following the issuance of the Investment Research Report. Although they did not identify the research report by name, Defendants Paucek and Graham addressed matters highlighted in the report during the call, confirming 2U's business plan.

133.    In his opening remarks, Defendant Paucek defended 2U's business model and implicitly rebuffed the Investment Research Report thesis. He opened the call by saying, "***Don't let the skeptic win***. That's one of our guiding principles and one that I love," before telling investors that 2U had an "outstanding" quarter and explaining that 2U's performance "is leading [the Company] to raise full year revenue guidance this quarter by over $2 million. At the midpoint of the new range, we expect year-over-year revenue growth of 43%."

134.    Defendant Paucek further declared that the Company was undergoing a "reacceleration of the grad business," stating*:*

> *The swing is indeed happening. Cathy will give some additional details and walk you through the pattern in regards to revenue in a moment.*
>
> Let's talk about why we're confident in the reacceleration over the next few years: enrollments and pipeline. First, enrollments. Most of the DGPs launched in 2018 have had their first class starts, and we're deep into the application cycle for all fall starts. So now we -- we now have high visibility into how we believe the 2018 cohort will scale.
>
>                 * * *
>
> So what about the other 34 programs? We believe most of them are still years away from reaching steady-state enrollments. These things take time. The first program in a vertical typically takes 5 to 6 years to achieve our projected steady-state enrollments.

Subsequent programs typically take 4 to 5 years. So we're still expecting enrollment growth in some of our oldest programs.

135.     Defendant Paucek reiterated the Company's growth strategy, saying, "[t]he second reason we're confident in the reacceleration over the next few years is our pipeline," and stating:

> Our pipeline is simply stronger than it's ever been. The 2019 cohort is nearly slotted. The 16th program is coming very soon. ***And in August of 2018, our new partnerships team is now deep in the process of signing programs for 2020. Next year, we expect at least 14 of our new programs will be MPV.*** Now you'll remember, these programs ramp enrollments faster than programs in new verticals. So we believe that the 2019 cohort will be an important contributor to the acceleration of revenue growth in the years to come.
>
> * * *
>
> Now to be clear, we don't want to sign all programs. Signing a program is not the important thing. ***Scaling it at quality is. And 2U has a track record of scaling enrollments that's better than anyone in the space.*** In 2016, there were roughly 950,000 masters and doctorates degrees conferred by U.S. universities. Our target of 80,000 to 85,000 conferrals implies an 8.5 percentage market share for 2U at steady state, single digits, folks. That's without accounting for any growth

136.     Defendant Paucek responded to an analyst's inquiry during the Q&A session by denying that the Company was having any issues marketing to students. The analyst inquired as to whether there were "[a]ny adjustments in the cost to obtain a student?" Defendant Paucek responded:

> ***Yes. I mean, student acquisition is -- it's inherently embedded in our LTR-TCA ratio.*** And clearly, our current financial statement shows expenses related to future periods of revenue. So that's kind of an irrelevant discussion, not your discussion, Mike. But – so we've actually -- I mean, ***Google click inflation is 1 example of something that we've dealt with our entire history as a company.*** And as we get greater scale, we are able to be more effective there, not less. Our relationship with the large companies that have channels, that we're working through has substantially improved over the last couple of years. And as of late, actually, Google click inflation has gone a positive direction. ***But regardless, the MPV strategy is clearly what drives our marketing efficiency. So today, we don't have a marketing efficiency issue.***

137.     Defendant Paucek emphasized the Company's expertise in digital marketing while praising the advantages of the 2U model over its competition:

> Our model delivers great outcomes for more students. Our model extends the mission and reach of the university. ***Our model makes it a more sustainable institution. Our***

38

*model works.*

The graduate segment is the organic growth engine powering 2U. FCE growth is beginning to reaccelerate. New student enrollments are strong across the portfolio. Pipeline is excellent. 2019 is nearly locked. And we're way ahead on 2020 pipeline progress. ***There's a lot of room to run, but most importantly, our partners are happy. They continue to extend existing contracts and add new programs. Our revenue share is simply not in question.***

**Oppenheimer Technology, Internet & Communications Conference**

138.    On August 8, 2018, Defendant Graham appeared at the Oppenheimer Technology, Internet & Communications Conference. During an exchange at that conference, Defendant Graham connected 2U's eventual profitability to the Company's growth plan*:*

So globally, higher education overall is a $1.9 trillion market and increasing in annual spend. ***Higher education in the U.S. is about $550 billion, and of that, graduate education is $80 billion. So we have -- it's a very large market that we are attacking.*** The reality is we don't want to do every single program within that and the reason being that we have -- we provide a lot of services, we have a not cheap model to run, and therefore, it really makes sense if a program can get to a certain size. If -- there are something like 1,700 different degrees that are granted by U.S. universities. We have said that we are targeting roughly 250 verticals -- or sorry roughly 250 programs within, say, 90 verticals or something like this. ***So we don't need to like penetrate all 1,700 of those degree verticals in order for us to get to be a fairly large company***. If you looked at that -- if you looked at the programs and they were all to get to an average steady state, now the reality is some will be larger and some will be smaller, but if they were all to get to, sort of, what we think that average is, that's approaching $4 billion in top line at steady-state just from those sorts of programs.

139.    In response to a question concerning the financials of the business and how investors should view long-term profitability, Defendant Graham stated that 2U was keeping a close watch on its student acquisition costs, stating:

One of the interesting things that we've been talking about most recently, and we mentioned this on our recent call, is that with our growth profile in new programs, ***we've been managing our overall portfolio pretty close to the percentage of the marketing cost per student on a portfolio basis that we would expect to see, which is somewhere in the 3 to 3.2:1 lifetime revenue of a student to the cost to acquire that student***. Now we've been having discussions about whether or not that actually makes sense at this kind of growth rate, because in effect what we are doing is we are not capturing all of the profitable students on some of the older programs so that we can

fund the newer programs.

140.    Defendant Graham contended that though some of the more expensive programs saw lower admissions, and the lower priced programs saw higher admissions, the Company investigated and determined the disparity systemic, stating:

> And what we saw this time, in the last couple of months . . . *was that some of our more expensive programs, actually kind of all had admit rates that were at the lower end of their band at the same time*. Now the fact that the 2018 cohort was actually growing very, very well, those tended to be lower priced than these over here. So while we saw a little reduction in admit rate, the dollars that came out from there weren't made up for by the dollars that were coming in here. *It's why what we said was we're still expecting for 30% year-over-year full course equivalent growth, but the revenue growth will be a little bit lower than that.* We've dug into it, we don't see anything systemic about it. It is the, sort of, aberrations of occasionally, even in a portfolio which tends to wash out those effects periodically, you get some that come in on the top and some that come in a little bit lower. And that's what we're, sort of, seeing wash its way through now. We have said that we do think it'll be relatively stable through the remainder of this year and early next.

141.    Defendant Graham concluded her answer by emphasizing again that the Company was still achieving the marketing efficiencies necessary to support its growth, stating:

> Just to be clear, we're not seeing any change in our revenue share. We're signing new programs in the same range as we've been signing before and we're not seeing changes in marketing efficiency. So in other words, we're still able to acquire students at the same kinds of prices that we were able to acquire students previously. *So if we're not seeing pressure in marketing and efficiency and we're not seeing pressure in take rate, then the rest is mix.*

142.    Following the Company's conference call on August 2, 2018, investors remained skeptical, and 2U's stock price continued to decline. Defendant Paucek participated in the KeyBanc Capital Markets Technology Leadership Forum on August 14, 2018. Before his visit, the Company declared that it would be releasing an increasing number of new initiatives in 2019, 2020, and 2021. Defendant Paucek made the following remarks on the launch at the start of the conference:

> [W]e're going to have a 16th for next -- 17th for next year and then upping the cadence for the year after, from 19 programs to 21, and then, for the first time, giving an actual

40

sort of target for 2021, which would be 25 DGPs.

>*And important to note that we believe those all represent similar economics to what we've run to date. So it's all a story of just an increasingly expanding pipeline. Our pipeline is stronger than it's ever been, and it's not close. It is the best we've ever seen it. It's because I fundamentally believe it's a simple business.* If the student wins, the university wins. If the university wins, we win. And we're winning. The schools are doing great, and most importantly, the students are having a really strong outcome.

143.    Also, during the conference, Defendant Paucek was asked what the launch of new programs meant for revenue targets in 2019 and 2020. Defendant Paucek began his response by stating the following :

>*Well, I mean, what I would say is I think it's pretty rare that a public company CEO is sitting on stage and gets asked about something about 2021, right, that kind of visibility or that kind of runway. Fortunately, our business actually has the kind of predictability where we can talk about out-years.* At the time when we announced that, it was simply because we had also announced our first acquisition, which, at that time, no one loved, now everybody loves it. That's a different story.

144.    Defendant Paucek continued to discuss the impact of the launches on future revenues, stating:

>With our now most recent quarter and with our guide for next year, we feel very comfortable that we believe that the core business is super strong and continues to grow. So it's reasonable to expect that more than 30% revenue growth, we've already told you 32% and 34% for next year. The reality is the core business has a huge amount of runway. It is in a momentum phase. It is getting more momentum. And one of the sort of false notions out there is that there is a marketing efficiency challenge. There is not. We're not having a marketing efficiency challenge. If anything, candidly, my regret, as a public company CEO, is over the last year, we had room to run in some of the older cohorts from a positive LTR-TCA standpoint. We had efficient marketing to deploy and ultimately chose the path of increasing margins on a fully allocated basis at the bottom line.

>                                    * * *

>We feel like the proof is in the pudding. They're fully allocated. They come out every year, and they prove that the core model is generating results. **And the reality *is many of our older programs not only have room to run from a marketing efficiency standpoint, but we're continuing to build more and more offerings into those programs to drive growth.***



146.    On November 5, 2018, the Company filed a Form 10-Q for the quarter ended September 30, 2018 (the "3Q 2018 10-Q") with the SEC, which contained signed certifications pursuant to the SOX by Defendants Paucek and Graham, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

147.    That same day, the Company also issued a press release on Form 8-K reporting third quarter 2018 ("3Q 2018") financial results. In the press release, Defendant Paucek is quoted saying:

> Strong year- over- year growth combined with our stepped- up program launch targets for 2019, 2020 and 2021, have put 2U on the path to $1.0 billion in revenue, which we expect to hit in a little over three years. Higher education is fully embracing the power of online, and ***2U's size, scale and track record put us in the pole position to seize new growth opportunities and further solidify our market leadership globally.***

148.    The press release also included updated revenue projections for full-year 2018 of between $411 and $411.9 million and fourth quarter 2018 revenue projections of between $114.4 and $115.3 million. That same day, Defendants Graham and Paucek hosted a conference call to discuss the Company's 3Q 2018 financial results. During the call, Defendant Paucek addressed growth in his opening remarks, stating:

> We're expecting consolidated revenue growth of 33.2% at the midpoint of our range. We're pleased with the resiliency of our grad portfolio and the power of our short course business, resulting in the type of expected growth that puts us in rarefied air among software companies. ***Look, it isn't common that a company keeps growing north of 30% off of a base of over $400 million in revenue. We said in the past that***

42

> *we expect to keep revenue growth above 30% for the "foreseeable future." We're now confident enough in the overall portfolio and the strength of the pipeline to put a timeline on it. We think we can keep consolidated revenue growth above 30% for at least the next 5 years.* Based on these current growth expectations, 2U expects to hit $1 billion in revenue in a little over 3 years. That used to be a long-range goal. Now it's right in front of us. We can see it. You'll hear more about the path to $1 billion in the coming quarters.

149.    Also, during the call, Defendant Paucek discussed the Company's plan to increase marketing spending in 2019 and framed it as driving future increased profitability rather than as something the Company needed to maintain current growth, stating:

> So let's talk about our overall marketing spend levels. It's clear to me today that we weren't investing enough across the entire grad portfolio as we rapidly accelerated new program launches.
>
> *The portfolio nearly doubled from second half '16 to second half '17. It's now obvious to us, in hindsight of course, that this should have driven a larger step up in marketing spend than we actually had. On a portfolio basis, this would have resulted in little to no margin expansion from 2016 to 2017.* Instead, grad segment profitability increased by 2.6 percentage points over that time period. So while the portfolio is strong, we had plenty of opportunities to see additional enrollment growth, which would have driven some additional revenue growth in the grad segment in both 2018 and 2019.

150.    Defendant Graham outlined the Company's goal to raise marketing expenditures in 2019, again framing it in terms of future profit growth:

> [I]n this period of rapid program launch expansion, we are going to ask you to assess this more through cohort profitability margins than through consolidated margin advancement. Until the balance of existing and new programs and marketing shifts further out on the maturity curve, we will weight our spend choices more heavily towards maximizing profitable individual program spend than optimizing short-term consolidated margins. *This is a meaningful factor in why we now expect a year-over-year decline in margins across our earnings measures for 2019.*

### Credit Suisse Technology, Media & Telecom Conference

151.    On November 28, 2018, Defendant Paucek appeared at the Credit Suisse Technology, Media & Telecom Conference. During the conference, he answered a question regarding USC's tightened admissions standards and the Company's margin projections for 2019. In his response, he stated:

So we had some leadership change, and the school decided to sort of become more selective. That is their prerogative, and ultimately, therefore, that program will decline slightly. And we've baked that into our numbers. ***Now with that said, we still guided the overall revenue growth rate for the company in line at 33%, and still show our core grad business growing at what we think is an impressive rate given our scale.*** So you're talking about long term, we think we can keep the overall company at a 30-plus percent growth rate for 5 years. Pretty rare you see that when you pass -- we just passed 400 and what, 12 million (sic) [$412 million]. So you're talking about pretty heady growth.

152.    Defendant Paucek also addressed unfavorable reactions to 2U's publication of the USC admissions decision during the conference.   In his statement, he emphasized  that 2U was  the  market leader in a rapidly evolving, but a very big market, that we think over time can turn 2U into one of the largest education companies on the planet." He then clarified that the USC admissions change was a limited issue that did not affect the Company's business model, emphasizing:

So what we didn't do, we did not conflate the USC problem with the margin decrease. And clearly, the world did, and they're not related at all. The USC is a very specific issue related to leadership change in a complicated moment at USC, having nothing to do with 2U. And margin, we ***brought down to invest more in programs that we thought we had room to run. Folks put those together and presumed that, that meant there's a marketing  efficiency issue, and I would tell you definitively, the story is not marketing efficiency. That you shouldn't conflate those two. We believe long-term, we've got great long-term efficiency built into the model and how can you see that***? You can see that in our annual cohort margins. They're fully allocated, and they show you sort of maturity of programs and profitability based on maturity. And we did disclose that our greater than 4-years programs would be in the low 40s, so fully allocated. So we believe investors should value the profitability in the program through the lens of those cohort margins.

153.    During the conference, Defendant Paucek further emphasized the Company's history of transparency with investors and the predictability of its business model, which, according to Defendant Paucek, enabled them to make revenue predictions with a high degree of certainty:

Well, look, I have a great Board and one of my Board members, Sallie Krawcheck said, these are your shareholders, if you know something, tell them. So we've been pretty transparent as a company. We've tried to provide detail, particularly when our model is not always fully understood by folks, like I still feel like folks don't understand that the current period marketing has very little impact on any current period revenue.

> [*W]e still feel today that, that's a pretty underappreciated aspect of the model. It's a long play.*
>
> *Now the positive of that -- the negative is, it's a bit steering a battleship. The positive of that, it is predictable, and it gives me really high confidence to say that in a little over 3 years, we hit $1 billion in revenue.* So we're focused on this path to $1 billion. Not that many companies that can get to that kind of scale and grow at that rate, and ultimately, the whole thing is about delivering for the student. 82% to 84% retention every quarter since we've been public, even though we've launched a large number of programs.

154.   Defendant Paucek also reiterated his earlier claims that 2U's business strategy is sustainable, scalable, and predictable, saying:

> Because with that long-term model, as long as I keep the cadence going, the increase in the number of programs I launch per year, you can model it per program at an average of $15 million or $16 million steady state and mid-30%s margins, and you can roll that out and you can see the power of the model. You can see yourself how long we can keep revenue growth really high. And the reality is, we don't get questions about pipeline anymore, but we should, because it's spectacular.

██████████████████████████████████████████

████████████████████████████

158.    On February 25, 2019, the Company filed a press release on Form 8-K reporting fourth quarter and full-year 2018 ("FY 2018") financial results. In a press release, the Company provided revenue guidance for the coming period, including anticipated full year revenue of between $546.6 and $550.8 million and anticipated first quarter 2018 ("1Q 2018") revenue of between $121.5 and $122.1 million.

159.    Also, on February 25, 2019, Defendants Graham and Paucek hosted a conference call to discuss the Company's FY 2018 financial results. In his opening remarks, Defendant Paucek stated, "I'm telling you, our business is resilient, it's diversified, and it's growing. ***Fourth quarter was rock solid.*** On the topline, revenue for the fourth quarter was $115.1 million, 33% growth over Q4 of 2017. And for 2018, we finished with $411.8 million in revenue, 44% growth over last year. Over 10 years in, we grew this company 44%."

160.    Defendant Paucek continued to discuss the Company's new programs, stating:

> Notably, there's a program from every single cohort in the top 20. Mature programs continue to enroll new students. ***Newer programs are scaling well, and the 2018 cohort continues to be excellent. In fact, 7 programs on the list were launched in the past 2 years.*** Let that land for a second, 7. So much for the theory that all of the new ones will be small and suboptimal.

161.    During her prepared remarks, Defendant Graham made the following statement regarding the economics of its graduate programs:

> What we're seeing now across all our program cohorts strongly validates the typical program economic life cycle we've consistently discussed with you and makes us very comfortable that to drive growth, increasing our investments in both new program launches and current program marketing are wise strategic decisions.

162.    During the Q&A session, Defendant Graham made the following statements on marketing expenditures and profits:

*So kind of what we have said is that you shouldn't think of this as being a continual degradation of margins on a year-over-year and continuing basis. This is kind of getting us back onto the right glide path from where such a number of our programs should be.* And I can't tell you, at this point, whether 2020 will sort of flatten out in margin or step up a little. But over time, I would say that our intention is to return to the kind of patterns that we had been seeing, which is you will see slow and -- slow but perhaps steady increases in margin over time as we move towards steady state. *You should keep in mind that for us, margins are, in many ways, a matter of choice as to how much investment we're making in growth, and I just want you guys to remember that, that this is very much within our control based on how quickly we decide to grow and what opportunities there are in front of us.*

163.    The following day, the Company filed a Form 10-K for the year ended December 31, 2018 (the "2018 10-K") with the SEC, which contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Paucek and Graham, attesting to the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

164.    On April 8, 2019, the Individual Defendants caused 2U to announce that it would acquire Trilogy, an adult-focused online educational company, for $750 million in cash and stock. In connection with the announcement, Defendant Paucek represented: "We expect the addition of Trilogy to accelerate our path to $1 billion in revenue by one year from 2022 to 2021 . . . ."





***First Quarter 2019 Financial Results***

170.    On May 7, 2019, the Company filed a Form 10-Q for the quarter ended March 31, 2019 (the "1Q 2019 10-Q") with the SEC, which contained signed certifications pursuant to the SOX by Defendants Paucek and Graham, the accuracy of the financial statements contained therein, the disclosure of any material changes to the Company's internal controls, and the disclosure of any fraud committed by the Company, its officers, or its directors.

171.    That same day, the Company filed a press release on Form 8-K reporting first quarter 2019 ("1Q 2019") financial results. In the press release, the Company provided revenue guidance for the coming period, including a reduction in projected revenue for full year 2019. The Company's revenue guidance by $13 million, to a range of $534 to $537 million.

172.    The press release stated, in pertinent part:

> 2U expects that of the revenue it recognizes in the second half of 2019, approximately 48% will be recognized in the third quarter.  Note that 2U's previously announced intention to increase marketing spend in the first half of 2019 is reflected in this guidance and **has the effect of driving larger second quarter losses than would be expected under typical performance patterns.**
>
> Further note that cost seasonality in the second and fourth quarters typically reduces margins in the first half of each year and improves margins in the second half of each year, so second-half margins should not be viewed as being a run rate for the first half of the following year.

173.    Also, that day, Defendants Paucek and Graham hosted a conference call to discuss the financial results. In his prepared remarks, Defendant Paucek assured that "2U is still very much a growth story" and that he saw no "challenges . . . attributable to weakness in [the Company's] efficiency at the top of the funnel." Rather, he explained the declining enrollment was caused by three factors, purportedly beyond the Company's control:

> As I take you through the specifics, you'll see there are still plenty of structural positives to report. Let's turn to 3 factors at play in our new 2019 expectations for the grad business. Number one, our partners are getting more selective, which impacts admit rate; number two, we're seeing some pressure mid-funnel on the rate at which prospective students are submitting their applications for review*;* and number three, we're seeing some slowness in the 2019 cohort, most importantly, one of our largest projected programs for the 2019 cohort had its launch date slip to later in the year for reasons beyond the control of the school and 2U.
>
> Before I get into specifics on each of these, *I want to make one thing clear. We do not believe the challenges we're seeing are attributable to weakness in our marketing efficiency at the top of the funnel*. We've said that before and are reiterating it again today. *Our data shows we're driving significant growth in the quantity of prospective students and started applications.* We're doing so at an average cost that has remained consistent with historical. It's actually down in many

spots. Across the portfolio, applicant quality remains steady.

174.    However, Defendant Paucek did acknowledge that he should have "taken some air out of the balloon" on 2U's growth story. He stated that the lower revenue guidance was "driven by a few challenges in the Grad segment." Defendant Graham attributed the lowered revenue guidance to "some decline in expected graduate program enrollments beginning in the second quarter and continuing through the rest of the year."

175.    Defendant Paucek stated:

> So what does this all mean for the grad segment moving forward? ***As I mentioned earlier, we aren't seeing declines in front-end marketing efficiency.*** We're generating more prospects and application starts than ever and doing so at a quality level and average cost that has been consistent over time. ***And the rate of admitted students that choose to enroll or yield has remained steady year-over-year.*** However, increased selectivity does put some pressure on total average spend per student. Now despite that, on average, our programs are generally more profitable than we anticipated

176.    Also, on the call, Defendant Paucek provided more positive details regarding enrollment, stating*:*

> Looking at the top 15 programs by new student enrollments, the average in 2019 is actually projected to be 3% higher than the 2017 average. So we believe that the average will go up even with the decline in our largest programs. ***In fact, if you exclude the top 5 programs from the calculation, enrollments for 6 through 15 are projected to be up 32%.***
>
> ***So we continue to see programs across the portfolio scale toward our target ranges for new student enrollments***. We still firmly believe in our runway of 250 DGPs. Pipeline for those programs is strong. We've got a bunch of announcements coming, but that's for another day.

177.    During the question-and-answer section, Defendant Paucek credited the decline in revenue projections primarily to admission decisions by the universities:

> Well, we're not going to – we can't go through intimate details about each. We sort of put them – ***the selectivity question we spent more time on for a reason. It's pretty significant.*** The cohort – it's interesting. The UC Davis MBA has started super strong sort of validating the fact that we obviously wanted it for a reason and expected

originally to be in '18, and then it went through a pretty long approval process that we didn't expect. So that's a good chunk of students right there that just comes out of the forecasts. ***And then the submit rates or the mid-funnel stuff is it's really quite a long list of individual program-related details and then a couple that go across the system. But we're not overstating on that one when we say it's really – it's a lot of different things that are often program-specific.*** So I would say there's a reason we focused more on selectivity. That's a big component of it. And that more than anything is what caused us to sort of call it and effectively reset this segment.

178.     Also, during the question-and-answer section, Corey Greendale of First Analysis Securities Corporation asked, "are you still comfortable with a model that says that maturity programs are doing the 300 to 500 per year[?]" In response Defendant Paucek stated:

Yes, we thought that was a really interesting part of the analysis of the whole thing. It's clear that like on some level, some of the programs that got really big, probably in our best interest overall to hit our 300 to 500 and not drive every program to its maximum size. ***And it's clear that the top ones have come down. Now at the same time, if you exclude the top 5, it's also clear that the next 10 are really going great. So you end up with this sort of clarity that the average, we like***. We feel very good about the 250 still. We don't feel like we have any reason to not believe that that's well within our opportunity set. ***We feel strong about the ranges***. But it's clear that the big ones did come down. So once again, felt like we should call it.

179.     In addition, during the question-and-answer portion of the call, Jeffrey Meuler of Robert W. Baird & Co. ("Meuler") asked, "what gives you confidence that not only is the cost per lead at the top of the funnel not eroding, but I'm more focused on the quality of the students coming into the top end of the funnel that they're as good of a quality of prospect as they've historically been[?]"

180.     In response Defendant Paucek stated:

***So we hit those – both those points pretty hard because we have really good data for both.*** And not only is prospect generation solid and high, it's at a cost that's totally within line and in a lot of places, lower. Meuler also noted "new enrollment trends are softening" and asked Defendant Paucek whether he expected "multiyear growth targets" to "reset lower."

181.     Meuler also noted that "new enrollment trends are softening" and asked Defendant Paucek whether he expected "multiyear growth targets" to "reset lower." Defendant Paucek responded:

Well, Jeff, we've kind of reset the number at 25%. And in part, we are dealing with

the fact that, long ago, we gave long-term expectations on a segment basis because we were worried about a reaction to an acquisition. ***And the reality is, at this point, we do feel like we've reset them solidly.*** You can obviously see the cadence. And with that cadence, you can have your own estimates as to what you believe will happen. But at this point, giving outyear guidance on a segment basis, we believe, is not the right call. ***Now to be clear, we do feel like we did reset this in a way that we feel very solid about.***

182.    Following Defendant Paucek's answer, Meuler asked him to explain whether resetting to 25% growth in 2019 pertains to ongoing growth. In response, Defendant Paucek affirmed that the reset did impact future years, stating:

> Yes. That is only a comment for 2019. ***It is not a recalibration for the future. And to be clear, our launch cadence is a factor in what we will think will happen in the outyears.***

183.    Also, during the question-and-answer section, Defendant Paucek had the following exchange with analyst Brian Schwartz of Oppenheimer & Co. and asked if the business remained "a 30%-plus grower here for the foreseeable future." In his response, Defendant Paucek said it was, explaining:

> Yes. I mean we did give consolidated guidance of 30%. So we still feel like that's where we are. You obviously heard a lot of commentary, Brian, about consolidated because we are – we think kind of, overnight, we became the market leader in Alternative Credential and we feel like people may just not understand what that is when we had them just labeled as short courses and do feel like we haven't really had much investor focus on that segment.

> * * *

> Now at the same time, grad segment growing at 25% this year, off of the base that it is, still higher growth than most people in our segment, most people in our space. So we do think it's right to sort of give this reset, ***but we feel very bullish about the long-term prospects for the company on both sides, grad and Alternative Credential.***

184.    On this news, the Company's share price fell $15.16, over 25%, to close at $44.77 per share on May 8, 2019, on unusually heavy trading volume.



186.     On July 30, 2019, 2U issued a press release in which it disclosed that costs had ballooned, forcing the Company to abandon its growth plans and reduce its fiscal 2019 guidance. The Company's expected net loss for fiscal 2019 had increased by $70 million, to a range of $157.5 to $151.5 million, representing a 300% year-over-year increase. The press release stated, in relevant part:

> "With the close of our Trilogy acquisition, 2U's business is evolving to better meet marketplace demand and the transforming needs of our university partners and lifelong learners," Co-Founder and CEO Christopher "Chip" Paucek said. "As we deliver our full portfolio of educational offerings to new and existing partners, we are also setting 2U on a defined path to profitability by tempering short-term growth projections and leveraging our scale to drive greater operational efficiencies across the business."

> \* \* \*

> Financial Outlook

> Based on information available as of today, 2U is issuing the following guidance for the third quarter and full-year of 2019. This guidance assumes foreign currency exchange rates as of June 30, 2019 remain constant, including the U.S. dollar/South African rand and the U.S. dollar/British pound.

| | | 3Q 2019 | FY 2019 |
|---|---|---|---|
| Revenue | | $147.6 - $152.6 | $565.7 - $575.7 |
| Net loss | | $(69.3) - $(66.3) | $(157.5) - $(151.5) |

| | | |
|---|---|---|
| Net loss per share | $(1.10) - $(1.05) | $(2.57) - $(2.47) |
| Adjusted net loss | $(33.8) - $(30.8) | $(76.9) - $(70.9) |
| Adjusted net loss per share | $(0.53) - $(0.49) | $(1.25) - $(1.16) |
| Weighted-average shares of common stock outstanding, basic | 63.2 | 61.3 |
| Adjusted EBITDA (loss) | $(18.4) - $(15.4) | $(28.0) - $(22.0) |
| Stock-based compensation expense | $18.9 - $19.9 | $56.0 - $58.0 |

The revenue reflected in this guidance includes a deferred revenue fair value purchase accounting adjustment related to the Trilogy acquisition. Adding back revenue eliminated as a part of purchase accounting, our revenue guidance ranges would be $153.6 million to $158.6 million and $576.9 million to $586.9 million for the third quarter and full year, respectively.

In giving third quarter and full-year guidance, the Company's expectations for the fourth quarter are implied. Note that the cost seasonality driven by reduced marketing spend during the holiday period in the fourth quarter typically improves margins in that quarter; fourth quarter margins therefore should not be viewed as a run rate for the first quarter of the following year.

187.    2U had a conference call the same day to go through these financial results with analysts and investors. During the call, the Company stated it was "moderating [its] outlook for the business in the short term." Defendant Paucek was clear that excluding the financial impact of Trilogy, this new guidance "implies a step down in revenue expectations for the rest of the business." To compete in an increasingly saturated education tech industry, 2U would have to make significant changes.

188.    Defendant Paucek stated:

*Today, the online education market is evolving. Secular forces are pushing more schools online. Indeed, it's becoming obvious that all schools are going online. We're calling it the mainstreaming of online education.* We believe this represents a new reality in the marketplace and requires us and others to adjust to it. We also believe that this new reality is one that 2U is uniquely positioned to benefit from due to our size and comprehensive product set. So we're adjusting our executional model against the dynamic of this mainstreaming of online education in a way that meets this new market dynamic.

Competition for students has increased. Programs will be slightly smaller than they

54

were in the past, but the scale benefits of 2U's overall operating model, a combination of 2UOS and products across the career curriculum continuum become even more important as more schools come online.

* * *

In the grad business, we tempered our enrollment and revenue expectations. We expect the average program enrollment at steady-state to come down from what we previously expected. ***We've accounted for some of the largest programs regressing toward the mean. Some of that was program-specific issues. However, we think it's prudent to expect fewer programs to substantially outperform these averages long term. Fewer super large programs does create less single program exposure or revenue concentration risk for 2U***. We're shifting our expectations per program going forward, but our scale becomes even more important as the market evolves.

189.     When an analyst inquired whether 2U reduced its investments due to diminished returns (caused by increased competition), Defendant Paucek confirmed: "Yes. The outer ring of students is more expensive." He conceded that this contradicted the Company's prior statements, stating:

Clearly, this may be frustrating to some in this community because last November, we did the opposite. ***That was a mistake. We've said that before. I will say it more strongly now. What we're doing today is reorienting our spend and our operation off of what is a smaller expected steady state enrollment, and we think that's a more prudent place to be and one that we should build a base from here.*** If we can get to not only successful so1i of business from a strategic standpoint in te1ms of our footprint but also drive profitability and free cash.

190.     On this news, the Company's stock price fell by $23.70, or 65%, to close at $12.80 per share on July 31, 2019, on unusually heavy trading volume.

## INSIDER SALES

191.     Before the declining enrollments and revenue projections were fully disclosed by 2U and understood by the market, the Insider Trading Defendants sold thousands of shares while in possession of material non-public Company information regarding the Company's business growth model and traded at high volume.

**Defendant Paucek**

192.    Defendant Paucek sold a total of 268,544 2U shares, while the price of the Company's stock was artificially inflated for approximately $22 million in proceeds while in possession of material, non-public information. As the Company's CEO and director, Defendant Paucek knew the truth about (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve promised growth and traded on such basis.

**Defendant Haley**

193.    Defendant Haley sold a total of 45,000 2U shares, while the price of the Company's stock was artificially inflated for approximately $3.9 million in proceeds while in possession of material, non-public information. As a director, Defendant Haley knew the truth about (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve promised growth and traded on such basis.

**Defendant Lewis**

194.    Defendant Lewis sold a total of 10,393 2U shares, while the price of the Company's stock was artificially inflated for $995,026 in proceeds while in possession of material, non-public information. As a member of the Audit Committee, Defendant Lewis knew the truth about (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve promised growth and traded on such basis.

**Defendant Chernis**

195.    Defendant Chernis sold a total of 30,000 shares of 2U shares, while the price of the Company's stock was artificially inflated for approximately $2.6 million in proceeds while in possession

of material, non-public information. As the Chief Operating Officer, Defendant Chernis knew the truth about (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve promised growth and traded on such basis.

**Defendant Kenigsberg**

196.    Defendant Kenigsberg sold a total of 22,806 of 2U shares, while the price was artificially inflated for approximately $1.5 million in proceeds while in possession of material, non-public information. As the Chief Technology Officer, Defendant Kenigsberg (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve promised growth and traded on such basis.

197.    In sum, Insider Trading Defendants sold over $32 million worth of stock at artificially inflated prices.

## THE INDIVIDUAL DEFENDANTS' WRONGFUL CONDUCT

198.     The Individual Defendants breached their fiduciary duties because they allowed or permitted the Company to disseminate false and misleading statements. Additionally, the Company's SEC filings and omissions caused the above-discussed internal failures caused or allowed the illicit activity described in this Complaint.

199.     The Individual Defendants breached their fiduciary duties because they failed to maintain an adequate system of oversight, disclosure controls and procedures, internal controls, and financial reporting.

200.    The Individual Defendants breached their fiduciary duties to 2U because they willfully or

recklessly made and/or caused the Company to make false and/or misleading statements and omissions of material fact regarding, at least, Forms 8-K, board book materials Proxy, press releases, and earnings calls described in this complaint. Defendants signed and authorized the SEC filings that were false and misleading because the Defendants falsely stated/or failed to disclose the following on their watch: (i) 2U's enrollment would decline in future periods, according to internal forecasts; (ii) the Company could not scale its student acquisition infrastructure efficiently and cost effectively; and (iii) as a result, the Company's business model was unsustainable to achieve promised growth.

### 2U's NON-EMPLOYEE DIRECTOR COMPENSATION

201.    The Board and Compensation Committee have repeatedly approved excessive director compensation without the approval of shareholders and without providing information or data to support their decisions.  Notably, as the Company's share price fell from 2018 through 2021, the Board in April 2019 and April 2021 materially increased its own compensation.

202.    As reflected in the chart below from the Company's Annual Proxy filed with the SEC on April 29, 2020 annual compensation per non-employee director in 2019 was $239,374.45.

| Name | Fees Earned or Paid in Cash ($)(1) | Stock Awards ($)(2) | Option Awards ($)(2) | Total ($) |
|---|---|---|---|---|
| Timothy M. Haley | 30,000 | 104,937 | 100,000 | 234,937 |
| Valerie B. Jarrett | 25,000 | 99,995 | 100,000 | 224,995 |
| Sallie L. Krawcheck | 25,000 | 99,995 | 100,000 | 224,995 |
| John M. Larson | 30,000 | 104,937 | 100,000 | 234,937 |
| Earl Lewis | 25,000 | 104,937 | 100,000 | 229,937 |
| Edward S. Macias | 25,000 | 99,995 | 100,000 | 224,995 |
| Paul A. Maeder | 30,000 | 119,885 | 100,000 | 249,885 |
| Alexis Maybank | 25,000 | 144,854(3) | 138,709(3) | 308,563 |
| Gregory K. Peters | 25,000 | 104,937 | 100,000 | 229,937 |

| | | | |
|---|---|---|---|
| Coretha M. Rushing | 25,000 | 99,995 | 100,000 | 224,995 |
| Robert M. Stavis | 30,000 | 114,943 | 100,000 | 244,943 |

203.    As reflected in the chart below from the Company's Annual Proxy filed with the SEC on April 21, 2022 ("2022 Proxy") annual compensation per non-employee director in 2021 was $303,400.

| Name | Fees Earned or Paid in Cash ($) | Stock Awards ($)(1) | Total ($) |
|---|---|---|---|
| Timothy M. Haley | 66,000 (2) | 230,900 | 296,900 |
| Valerie B. Jarrett (9) | 60,000 (3) | 230,900 | 290,900 |
| Sallie L. Krawcheck | 60,000 (3) | 230,900 | 290,900 |
| John M. Larson | 70,000 (4) | 230,900 | 300,900 |
| Earl Lewis | 67,500 (5) | 230,900 | 298,400 |
| Edward S. Macias | 60,000 (3) | 230,900 | 290,900 |
| Paul A. Maeder | 136,500 (6) | 230,900 | 367,400 |
| Alexis Maybank | 65,000 (7) | 230,900 | 295,900 |
| Gregory K. Peters | 67,500 (5) | 230,900 | 298,400 |
| Coretha M. Rushing | 65,000 (7) | 230,900 | 295,900 |
| Robert M. Stavis | 80,000 (8) | 230,900 | 310,900 |

204.    These amounts are excessive, and approach the average director compensation for non-employee directors on boards of "large-cap" companies, companies included in the S&P 500, and even the largest companies in the country, which are included within the Top 200 Company list.[1]

---

[1] See NACD and Pearl Meyer 2020-2021 Director Compensation Report (average of median total direct annual compensation of $311,955 for non-employee directors at a Top 200 Company (with market capitalizations exceeding $10 billion), and an average of median total direct annual compensation of $256,225 for non-employee directors at large-cap companies (with market capitalizations between $2.5 billion and $10 billion)); 2021 U.S. Spencer Stuart Board Index (total average compensation of $312,279 for non employee directors at S&P 500 companies); 2020 U.S. Spencer Stuart Board Index (total average compensation of $308,462 for non- employee directors at S&P 500 companies); 2019 U.S. Spencer Stuart Board Index (total average compensation of $304,856 for non-employee directors at S&P 500 companies); 2018 U.S. Spencer Stuart Board Index (total average compensation of $298,981 for non-employee directors at S&P 500 companies).

205.   2U is neither a Top 200 Company, member of the S&P 500, nor even a large-cap company. Indeed, with a current market capitalization of approximately $590 million, 2U is considered a "small-cap" company.

206.   2U attempts to justify its director compensation in the 2022 Proxy with the following:

upon the recommendation of the Compensation Committee and based on the annual review and assessment of our director compensation program provided by the independent compensation consultant, which indicated that our director compensation fell between the 25th and 50th percentile of director compensation paid by our compensation peer group, our Board approved increasing the annual retainer fee and annual equity grant and increasing the retainer fees for committee chairs and members.

207.   That a compensation consultant was retained, did work, and identified so-called peers is insufficient to establish the appropriateness of the Company's non-employee director compensation. Just because a consultant was retained does not mean that their advice was followed.  Similarly, reference to so-called "peer" companies without identifying them – is irrelevant.

208.   2U's non-employee director compensation would be shocking enough, even at a large and profitable Company. Here, however, it lacks even the appearance of propriety, given that the Company operates at a loss.   Thus, he Company's non-director compensation practices seem to take no consideration of its financial wellbeing whatsoever and has harmed the Company and its stockholders.

## DAMAGES TO 2U

209.   As a direct and proximate result of the Individual Defendants' conduct, 2U will lose and expend many millions of dollars.

210.   Such expenditures include, but are not limited to, the $37,000,000 that defendants have agreed to pay plaintiffs to settle the Securities Action, legal fees associated with the Securities Action, any internal investigations, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

211.   Additionally, these expenditures include, but are not limited to, lavish compensation and

benefits paid to the Individual Defendants who breached their fiduciary duties to the Company.

212.    As a direct and proximate result of the Director Defendants' conduct, 2U has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Director Defendants' breaches of fiduciary duties.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

213.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Individual Defendants.

214.    Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and have retained counsel competent and experienced in derivative litigation.

215.    Plaintiff is a current owner of the Company stock and has continuously owned Company stock during all relevant times.

216.    Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

217.    Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act, and Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action.

218.    The Company Board is currently comprised of eleven members: Haley, Krawcheck, Larson, Lewis, Macias, Maeder, Paucek, Peters, Maybank, Rushing, and Stavis (collectively, the "Director Defendants"). Thus, Plaintiff is only required to show that six current Company directors, cannot exercise independent objective judgment about whether to bring this action or whether to

vigorously prosecute this action. Demand is excused as to all the Director Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of their knowing or reckless engagement in the scheme to make and/or cause the Company to make false and misleading statements and omissions.

219.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

220.    Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

221.    All of the Director Defendants receive the challenged compensation, stand on both sides of the compensation awards, and have a direct interest in the transactions at issue. Additionally, the challenged compensation constitutes a substantial personal benefit to the Director Defendants. The Director Defendants therefore breached their fiduciary duties, are not disinterested, and demand is excused as to them.

222.    Additionally, each of the Director Defendants received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of the Company.

**Defendant Paucek**

223.    Defendant Paucek faces a substantial likelihood of liability because, in breach of his fiduciary duties, he personally issued the misleading statements alleged herein.  Defendant Paucek is also

incapable of considering demand because he is the Company's CEO and, therefore, is not independent. As a 2U employee, Defendant Paucek derives substantially all of his income from his employment with 2U and, thus, could not disinterestedly consider a demand for action that might require him to sue the directors that control his continued employment and/or fellow members of management with whom he works on a day-to-day basis.

224.    Defendant Paucek, while in possession of material non-public information, sold a minimum of 268,544 shares of the Company's stock at various prices per share for a windfall of $22 million, and this sale demonstrates his motive in facilitating and participating in the fraud.  As a result of his insider selling, Defendant Paucek may be personally subject to disgorgement.

225.    For these reasons, Defendants Paucek breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendants Paucek, Hayley and Lewis**

226.    Defendant Paucek, while in possession of material non-public information, sold a minimum of 268,544 shares of the Company's stock at various prices per share for a windfall of approximately $22 million, and this sale demonstrates his motive in facilitating and participating in the fraud.  As a result of his insider selling, Defendant Paucek may be personally subject to disgorgement.

227.    Defendant Lewis, while in possession of material non-public information, sold a minimum of 10,393 shares of the Company's stock at various prices per share for a windfall of $995,026, and this sale demonstrates his motive in facilitating and participating in the fraud.  As a result of his insider selling, Defendant Lewis may be personally subject to disgorgement.

228.    Defendant Hayley, while in possession of material non-public information, sold a minimum of 45,000 shares of the Company's stock at various prices per share for a windfall of $3.9

million and this sale demonstrates his motive in facilitating and participating in the fraud. As a result of his insider selling, Defendant Hayley may be personally subject to disgorgement

**Defendants Lewis, Peters, Maeder, and Stavis**

229.    Defendants Lewis, Peters, Maeder, and Stavis served as members of the Audit Committee. Pursuant to the Audit Committee's Charter, the purpose of the Committee is to assist the Board in fulfilling its oversight responsibilities related to, inter alia, accounting, legal, regulatory, and public disclosure requirements. Thus, these Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's business (i) business growth model and (ii) revenue projections. Further, these Defendants reviewed and approved the improper press releases made to the public. Despite their knowledge or reckless disregard, these Defendants caused these improper statements. In addition, these Defendants engaged in corporate misconduct by violating 2U's Code of Conduct because they possessed non-public information regarding the declining enrollments and sustainability of its growth model and its impact on the Company's revenue projections and engaged in self-dealing by trading on such information.

230.    For these reasons, Defendants Lewis, Peters, Maeder, and Stavis breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Defendants Larson, Maybank, and Rushing**

231.    Defendants Larson, Maybank, and Rushing served on the Compensation Committee, they were charged with evaluating the CEO's performance, and their failure to properly do so makes them especially culpable for the wrongful conduct described herein. They conducted little, if any, oversight of the Company's performance and shareholder return. They consciously disregarded their duties to consider a number of factors when assessing the incentive component of executive compensation because

Defendants Larson, Maybank, and Rushing relied on certain growth business models, such as unreasonable projection in the Graduate and Short Course Programs.

232.    Defendants Larson, Maybank, and Rushing also authorized and/or permitted the issuance of their own excessive compensation, are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it. These Defendants failed to uphold their responsibilities with integrity and rewarded the Director Defendants for their misconduct.

233.    For these reasons, Defendants Larson, Maybank, and Rushing breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and thus demand upon them is futile and, therefore, excused.

**Paucek, Maeder, Stavis, Peters, Haley, Lewis, Rushing, Krawcheck, Larson, and Macias**

234.    Defendants Paucek, Maeder, Stavis, Peters, Haley, Lewis, Rushing, Krawcheck, Larson, and Macias served on the Board and knew of the material adverse trends impacting the Company's Graduate Division, which accounted for the majority of 2U's revenues and profits. Yet they signed the Registration Statement and 2017 10-K and knew that these documents omitted these material adverse trends. As a result, Paucek, Maeder, Stavis, Peters, Haley, Lewis, Rushing, Krawcheck, Larson, and Macias are defendants in the Securities Action and face a substantial risk of liability. As such, they are not disinterested, and demand is excused from them.

235.    The Directors, as members of the Board, were and are subject to the Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations. The Code of Conduct requires the Directors to also adhere to 2U's standards of business conduct. The Directors did not comply with the requirements of the Code of Conduct.  The Directors violated the Code of Conduct because they knowingly or recklessly engaged in and facilitated the misconduct alleged herein and participated in making and/or causing the Company to make the materially

65

false and misleading statements alleged herein.  Because the Directors violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

236.    Furthermore, demand, in this case, is excused because the Director Defendants control the Company and are indebted to each other. The Director Defendants have a longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. These conflicts of interest precluded the Directors from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct.  Thus, any demand for the Directors would be futile.

237.    2U has been, and will continue to be, exposed to significant losses due to the wrongdoing complained of herein. Yet, the Directors have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for 2U any part of the damages 2U suffered and will continue to suffer, thereby. Thus, any demand to the Directors would be futile.

238.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Directors can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

239.    The acts complained of herein constitute violations of fiduciary duties owed by 2U's officers and directors, and these acts are incapable of ratification.

240.    The Directors may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of 2U. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Directors, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Directors were to sue themselves or certain of the officers of 2U, there would be no directors' and officers' insurance protection.  Accordingly, the Directors cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Directors is futile and, therefore, excused.

241.    If there is no directors' and officers' liability insurance, then the Directors will not cause 2U to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

242.    Thus, for all of the reasons set forth above, all of the Directors, and, if not all of them, certainly at least six of them, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I
### AGAINST THE INDIVIDUAL DEFENDANTS
### FOR BREACH OF FIDUCIARY DUTIES

243.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

244.     Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of 2U's business and affairs.

245.     Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision. The Individual Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of 2U's shareholders.

246.     In breach of their fiduciary duties owed to 2U's, the Individual Defendants willfully or recklessly caused the Company to violate federal regulations by falsely stating and/or failing to disclose the Company's true business performance, as alleged herein.

247.     The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct those public statements and representations. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth, in that they failed to ascertain and disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of 2U's securities.

248.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to engage in the fraudulent schemes set forth herein improperly and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the

Company to engage in the fraudulent schemes improperly and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of 2U's securities.

249.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

250.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, 2U has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. Plaintiff, on behalf of 2U, has no adequate remedy at law.

## COUNT II
## AGAINST DIRECTOR DEFENDANTS FOR
## BREACH OF FIDUCIARY DUTIES – EXCESSIVE COMPENSATION

251.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

252.    The Director Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Director Defendants owed and owe the Company the highest obligations of good faith, candor, loyalty, and due care.

253.    The Director Defendants, together and individually, violated and breached their fiduciary duties of good faith, candor, loyalty, and due care. Specifically, the Director Defendants approved their own improper and grossly excessive compensation without meaningful limits or controls, and without regard for the compensation paid by peers, or the Company's stock price, revenue, and market capitalization.

254.    The Director Defendants also breached their fiduciary duties to Company shareholders by failing to take remedial action in the face of these excessive awards.

255.    As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, 2U has sustained significant damages. As a result, the Director Defendants are liable to the Company.

**COUNT III**
**AGAINST DIRECTOR DEFENDANTS FOR**
**VIOLATIONS OF SECTION 14(a) OF THE EXCHANGE ACT**

256.    Plaintiff hereby incorporates the allegations in the foregoing paragraphs as if fully set forth herein.

257.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that,

> [i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l].

258.    Rule 14a-9, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

259.    Under the direction and watch of the Director Defendants, the Company made materially misleading statements in its Annual Proxy filed with the SEC on April 30, 2019 ("2019 Proxy"). Specifically, the 2019 Proxy Statement falsely stated and failed to disclose that (i) the Company's forecasted student enrollment numbers were precipitously declining; (ii) the Company's student acquisition model would not scale to correspond to the enrollment requirement

of its expanding portfolio of programs; (iii) the Company's student acquisition expenses were swiftly and inexorably rising; (iv) the Company encountered substantial competition in the market for student enrollments; and (v) the Company's pace of revenue growth rate from student enrollments was decelerating.

260.    The Director Defendants knew or should have known that by misrepresenting and/or failing to disclose the foregoing material facts, statements contained in the 2019 Proxy were materially false and misleading.

261.    The Company was damaged as a result of the Director Defendants' material misrepresentations and omissions in the 2019 Proxy.

262.     Plaintiff has no adequate remedy at law.

<u>COUNT IV</u>
**AGAINST INDIVIDUAL DEFENDANTS**
**FOR UNJUST ENRICHMENT**

263.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

264.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material information, the fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of 2U.

265.    Each of the Defendants received payment from 2U, in the form of either salary or director fees while actively breaching their fiduciary duties to 2U.

266.    All the payments and benefits provided to defendants were at the expense of 2U. The Company received no benefit from these payments.

267.    Plaintiff, as a shareholder and a representative of 2U, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits -- including from benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the

Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties. Plaintiff on behalf of 2U, has no adequate remedy at law.

**COUNT V**
**AGAINST INDIVIDUAL DEFENDANTS**
**FOR WASTE OF CORPORATE ASSETS**

268.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

269.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused 2U to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, and to lose assets from investors and customers who no longer trust the Company.

270.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

271.    Plaintiff on behalf of 2U has no adequate remedy at law.

**COUNT VI**
**AGAINST THE INSIDER TRADING DEFENDANTS FOR**
**BREACH OF FIDUCIARY DUTIES AND DISGORGEMENT**

272.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein

273.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Insider Selling Defendants were unjustly enriched at the expense of, and to the detriment of, 2U.

274.    The Insider Trading Defendants had access to non-public information concerning 2U.

275.    The Insider Trading Defendants are fiduciaries of 2U, possess material, non-public

information of 2U, and used that information improperly in selling 2U stock because they were motivated, in whole or in part, by the substance of that material, non-public information of 2U, and acted with scienter.

276.   The Insider Trading Defendants profited from their misconduct and their exploitation of material and adverse inside information.

277.   The other Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from 2U that was tied to the performance or artificially inflated valuation of 2U, or received compensation or other payments that were unjust in light of the Defendants' bad faith conduct.

278.   Plaintiff, as the representative of 2U, seeks disgorgement of all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Insider Trading Defendants due to their wrongful conduct and breach of their fiduciary duties.

## **<u>REQUEST FOR RELIEF</u>**

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

a)   Declaring that the Plaintiff may maintain this action on behalf of 2U, and that Plaintiff is an adequate representative of the Company;

b)   Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to 2U;

c)   Determining and awarding to 2U the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

d)      Directing the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect 2U and its shareholders from a repeat of the damaging events described herein;

e)      Awarding punitive damages;

f)      Awarding 2U restitution from Individual Defendants, and each of them;

g)      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

h)      Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: September 22, 2022                    **RIGRODSKY LAW, P.A.**

                                             */s/ Seth D. Rigrodsky*
                                             Seth D. Rigrodsky (#3147)
                                             Gina M. Serra (#5387)
                                             Herbert Mondros (#3308)
                                             300 Delaware Avenue, Suite 210
                                             Wilmington, DE 19801
                                             Telephone: (302) 295-5310
                                             sdr@rl-legal.com
                                             gms@rl-legal.com
                                             hwm@rl-legal.com

                                             **MOORE KUEHN, PLLC**
                                             Justin A. Kuehn
                                             Fletcher W. Moore
                                             30 Wall Street, 8th floor
                                             New York, New York 10005
                                             Telephone: (212) 709-8245
                                             jkuehn@moorekuehn.com
                                             fmoore@moorekuehn.com

                                             *Attorneys for Plaintiff*

Public Version Dated: September 23, 2022

74